Filed 6/28/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S138474 |
| v. | ) | |
| | ) | |
| ERIC ANDERSON, | ) | |
| | ) | San Diego County |
| Defendant and Appellant. | ) | Super. Ct. No. SCE230405 |
| _____ | ) | |

A jury convicted defendant, Eric Anderson, of the first degree murder of Stephen Brucker under the special circumstances of murder in the commission or attempted commission of robbery and burglary.  It also convicted him of conspiracy to commit robbery and burglary and two counts of residential burglary. It found defendant personally discharged a firearm during the commission of the murder and conspiracy.  After defendant waived a jury, the court convicted him of being a felon in possession of a firearm.  It also found true that he had suffered two prior serious felony convictions and a third strike conviction, and that he had served one prior prison term.  After a penalty trial, the jury returned a verdict of death.  The court denied the automatic motion to modify the verdict and imposed a judgment of death.  It also imposed a prison sentence on the other counts and enhancement allegations.  This appeal is automatic.

We modify the judgment by striking a one-year enhancement the trial court imposed for the prior prison term and, as modified, affirm the judgment.

1

# I. THE FACTS

## A. Guilt Phase

### 1. Overview

Defendant and others conspired to commit burglary and robbery at the home of Stephen Brucker. On April 14, 2003, when the conspirators arrived at the home, Brucker confronted them at the door. Defendant shot Brucker in the chest, mortally wounding him, after which the conspirators fled. Previously, defendant had committed two other residential burglaries.[1]

### 2. Prosecution Evidence

#### a. The Completed Burglaries

On January 8, 2003, the home of Arlene Bell in La Mesa was burglarized. The home was ransacked, and many items were taken, including a carved jewelry box with a "Made in Poland" label and some silver coins. Police later found the jewelry box and silver coins in defendant's residence in Poway. The items were found in the bedroom of defendant's housemate, James Stevens, to which defendant had access. Inside the jewelry box were credit cards in defendant's name. Later, a cell phone not belonging to the Bell family was discovered in their house. It had apparently fallen under a load of firewood. Defendant was the subscriber of the cell phone's telephone number.

On April 9, 2003, the home of John and Pamela Dolan in Alpine was burglarized. The home was ransacked, and various items were missing, including a .22-caliber handgun and a ring containing the inscription "Jenny." Defendant

---

[1]    Originally, there were three codefendants: Brandon Handshoe, Apollo Huhn, and Randy Lee. None are involved in this appeal. Handshoe pleaded guilty to reduced charges and agreed to testify. Lee was tried with defendant and acquitted of all charges. Huhn was tried simultaneously but with a different jury. He was convicted of murder with special circumstances and conspiracy. His judgment was later reversed on appeal.

later gave the ring to his girlfriend's mother, who turned it over to law enforcement. The stolen handgun was found under the seat of the Ford truck defendant was driving when he was arrested in Oregon on May 16, 2003.

Matthew Hansen, a San Diego police officer, lived across the street from the Dolan home. The day of the burglary, he heard a Ford Bronco that was "kind of loud" drive down the Dolan driveway. When the Bronco emerged from the driveway, Hansen paid particular attention. He "could distinctly hear it because it was loud sounding leaving his driveway." The next day, while driving in the area, Hansen observed the same Bronco, with the same loud sound. It "sound[ed] like there was some sort of exhaust problem on the vehicle." Defendant was the driver. Hansen wrote down the Bronco's license number. The vehicle had been purchased by, and was registered to, defendant. Police sometimes saw it at defendant's residence.

### b. The Brucker Crimes

Stephen Brucker lived with his family in an unincorporated area of El Cajon. Randy Lee was familiar with the Brucker home and knew that the family had a safe. Zachary Paulson, Brandon Handshoe, and Valerie Peretti (Apollo Huhn's girlfriend, who was 15 years old and pregnant in April 2003) all testified that, at various times beginning in 2002, Lee suggested to Handshoe and Huhn that they burglarize the Brucker house and steal the safe, which, Lee said, contained $1 million (according to Paulson) or $2 million (according to Peretti).

In early April 2003, defendant, Handshoe, and Huhn gathered at Handshoe's mobilehome in the Rios Canyon area of El Cajon and discussed burglarizing the Brucker home to steal the safe. Paulson testified he was present at the mobilehome in the first week in April when they discussed a robbery. Huhn said he could "get into the safe." Defendant said that "he could hold the guy

3

hostage" and would "pistol whip him" if necessary.  Handshoe said he would "watch out."

Peretti testified that on April 14, 2003, she went to Handshoe's mobilehome around 12:30 p.m.  Defendant, Huhn, and Handshoe were present. She sensed that the others did not want her to be there.  But then Handshoe told defendant that it was "okay" because she was Huhn's girlfriend.  Handshoe told her they were going to rob someone.  She observed defendant "messing with some guns."  She also saw him with a bag containing "disguises."  He had some kind of a "hair piece" that was "salt and pepper" colored, and thick glasses.  The three talked "about how they were going to do this."  Defendant asked for a piece of paper, then started drawing what Peretti described as "diagrams . . . of the house and how he was going to do it."  Defendant did most of the talking.  Defendant "said how they were going to go and do it, and what cars were supposed to be there, and how the doorway or something was set up."  He told Handshoe "that he was going to stand over him while Brandon [i.e., Handshoe] could go in and get the safe or whatever he wanted to do."  Defendant told Huhn to "keep watch." Peretti testified that defendant "seemed like he had done this before," but Handshoe and Huhn were nervous and scared.

Defendant, Huhn, and Handshoe left the mobilehome in defendant's Bronco, with defendant driving.  Before they left, defendant pulled out a semiautomatic firearm from his waistband, cocked it, said, " 'Let's do this fast,' " then put the gun back in his waistband.  He provided gloves to Handshoe and Apollo from his bag.  Handshoe also had a firearm.  They were gone for about half an hour.  Huhn returned first, appearing scared and upset.  Handshoe returned later.

Peretti admitted that when she first talked to her father and the police about the crime, she did not tell them that Huhn had gone with the others.  She said she

4

did not tell them about Huhn's involvement "[b]ecause I loved him. He's my kid's father." She received immunity for her testimony.

Handshoe testified that on April 14, 2003, he was at his mobilehome with Peretti, Huhn, and defendant. Defendant had a black .45-caliber firearm, and he was "jacking rounds out of it." At one point, Handshoe gave defendant a piece of paper on which defendant drew a map. Defendant said something to the effect of, "We're going to do this right." Defendant supplied Handshoe with a gun, which Handshoe kept in his pocket and did not use.

Defendant, Huhn, and Handshoe then went to the Brucker home to burglarize it. Defendant drove the three of them in his Bronco. When they arrived, Handshoe remained in the car on the driveway acting as a "lookout." He had a walkie-talkie that defendant had supplied. Defendant, his firearm tucked under his arm, and Huhn walked towards the front door and out of Handshoe's line of vision. Defendant was wearing what Handshoe said was a "disguise"—a baseball cap and a wig. They were gone at most two minutes. Then Handshoe heard a gunshot followed by a scream. Defendant and Huhn ran back to the car and they "took off," with defendant driving. Defendant "said something along the lines of things went wrong and he shot the guy."

While they were driving, Handshoe asked to get out of the car. Defendant dropped him off, telling Handshoe that "if we were to say anything, we would be next." Handshoe went to a friend's house then returned to his home. Peretti and Huhn were there when he returned.

After being shot, Brucker called 911. He told the dispatcher that two White males knocked on the door, and then one of them shot him in the heart. San Diego County Deputy Sheriff Karl Miller was the first law enforcement officer to respond. The front door of the Brucker house was open but the screen door was closed. Deputy Miller heard someone inside say, " 'I'm in here.' " He went

5

inside and observed Brucker on the telephone. Brucker had blood "all down to his waist area." He was conscious but in a lot of pain.

Deputy Miller asked what happened. Brucker responded that he had heard somebody at the front door. He went to the door and saw two men standing there. Brucker "told them to leave the property or, in his words, 'Get the fuck off my property.' " After the men said something in reply, Brucker repeated to them what he had said. Then, Brucker reported, one of the men said, "Fuck you," and shot him in the chest. He described the shooter as White, in his "30's," with a "salt-and-pepper beard," and wearing a black and white baseball cap. Of the other man, Brucker said only that he was "a 20 year old." (Defendant was 29 years old at the time, Huhn was 22.)

Brucker was rushed to the hospital but soon died of a single gunshot wound to his torso. A .45-caliber shell casing was found near the front door of the house.

Several witnesses who lived in the area testified that around the time of the shooting, they observed a Bronco generally described as similar to defendant's either emerging from the Brucker house or nearby. One witness said the vehicle was going fast, and the driver was wearing a "ball cap." Another witness said the vehicle went "zooming" by, and it was "very loud." Another witness said the vehicle had a loud and distinctive sound. One witness thought the Bronco she saw was lighter in color than defendant's. Previously, the same witness had told an investigator that the driver was wearing a baseball cap and sunglasses and had a mustache.

Travis Northcutt, a roommate of defendant's along with James Stevens, told Steven Baker, an investigator with the district attorney's office, that defendant had told him "that something big was going to happen, a big hit that involved a safe." Northcutt also told the investigator that when he, Stevens, and defendant were watching a newscast of the Brucker murder, defendant told him to " 'keep

6

his fucking mouth shut,' that he was only the third person to know that [defendant] was involved and if he didn't keep his mouth shut, he would be next." Northcutt also said he had seen defendant wearing a "goofy hairpiece." When called to testify, Northcutt generally denied the truth of these statements.

Charlene Hause, who had been defendant's girlfriend, testified that he normally drove a Bronco. But the last time she saw him, later in April 2003, he drove a white truck. He told her he was using that truck "because they knew his Bronco." He had shaved off his mustache and said he was leaving the San Diego area because of a parole violation.

Defendant's parole agent testified that on April 30, 2003, when defendant was at large, and after stolen property had been found in James Stevens's and defendant's residence, resulting in Stevens being placed into custody, defendant left a message on the voicemail of Stevens's parole agent's saying, " 'It's all fucking mine. Come and get me.' "

After the shooting, defendant went to Oregon. On May 16, 2003, Oregon police stopped him while driving a white truck in Harney County. He had no identification and said his name was James Stevens. The truck contained materials for making false identification cards, a handcuff key, and the handgun stolen from the Dolan home. Defendant was arrested and booked into the local county jail under the name of James Stevens. His true identity was learned the next day. A further search of the truck revealed a book entitled, "Counterfeit I.D. Made Easy," with several passages highlighted in pink.

Three witnesses who had shared a cell with defendant in the Oregon county jail after his arrest testified that he talked to them about his plans to escape, which included the possibility of violence against the guards. He showed each of them a handcuff key in his possession. One of the cellmates drew for defendant a sketch of the nearby town of Burns and the jail's location. A search of defendant's cell in

7

July 2003 uncovered the sketch, a bent piece of plastic, three razor blades in a deck of cards, and two handcuff keys, one on defendant's person.

In December 2003, Zachary Paulson, then an inmate in the San Diego County jail, where defendant was also incarcerated, testified against defendant at the preliminary hearing in this case. On February 14, 2005, several inmates, including defendant, assaulted Paulson in jail, inflicting serious injuries.

The prosecution also presented telephone records and testimony showing the existence, although not the content, of telephone calls among the various participants during relevant times.

### 3. Defense Evidence

Defendant presented evidence attempting to raise a reasonable doubt as to his guilt, including evidence challenging the credibility of prosecution witnesses, especially Handshoe, Paulson, and Peretti; evidence that he often drove a white truck; evidence regarding his appearance at different times; and evidence that the Bronco seen in the area of the crime might not have been his.

Jeffrey Gardner, a construction contractor, testified that he employed defendant the day after the Brucker murder. Defendant arrived at the jobsite before 7:30 a.m. that morning. The white truck, but not the Bronco, was there. Defendant was calm and appeared his usual self according to Gardner.

James Stevens testified that sometimes he drove defendant's Bronco and sometimes defendant drove his white truck. The day of the Brucker murder, defendant drove Stevens's truck. Stevens saw defendant that evening and noticed nothing unusual about his behavior. The two went to work together the next morning. Stevens denied that he had ever been with Travis Northcutt and defendant watching coverage of the Brucker murder or that he heard defendant tell someone to "shut the fuck up."

8

### B. Penalty Phase

#### 1. *Prosecution Evidence*

The prosecution presented evidence that in July 1995, while driving a truck, defendant fired around 12 shots from a .22-caliber firearm at the driver of a car that passed in front of him. He told his passenger something along the lines of, "That fucking bitch, who does she think she is?" Defendant later told a cellmate in Oregon "that somebody in the white car had just aggravated him and he unloaded a clip at the car."

In March 1995, defendant was convicted of one count of residential burglary and one count of possession of a stolen vehicle. In July 1995, he was convicted of two counts of residential burglary.

#### 2. *Defense Evidence*

Paul Mason testified that in 2003, he was a cellmate of Apollo Huhn. Huhn told Mason that he went to the door of the Brucker home with "Brandon," and Huhn was the one who shot Brucker.

Other than Mason's testimony, defendant stated that he did not want his attorneys to present evidence in mitigation. However, the court permitted him to make a statement to the jury. He told the jury the following:

"I've given a lot of thought to what I want to say to you guys, but, you know, start off is nine pages. I'm down to one page, because, basically, I think anything I say to you would be a wasted breath. I don't think you'll pay attention to anything I got to say. In one ear, out the other. But I feel compelled to tell you two things: One is that I don't give a shit. Give me the death penalty. If you believe I'm guilty, kill me. The second is: I'm innocent. Your verdict was wrong, and I hope you all can't sleep with yourselves. I don't know what you expected from my attorneys. This ain't Perry Mason or Matlock. No one is going

9

to run into a courtroom saying, 'I did it.' What the hell did you expect? Did you not listen to the witnesses? Not a single piece of evidence."

At this point, the court told defendant that this was his chance to address mitigating factors, not to admonish the jurors. Defendant then completed his statement: "I really despise all of you and your decision. I don't think you were reasonable or fair. Thanks for nothing."

## II. DISCUSSION

### A. Issues Regarding Guilt

#### 1. Denial of Motions to Sever the Defendants

Defendant moved to sever his trial from that of the codefendants, Handshoe, Huhn, and Lee. The court denied the motion, but to protect defendant, it ordered that Huhn be tried in front of a different jury than defendant and Lee. Later, defendant joined codefendant Lee's separate severance motion. The court denied that motion also. Defendant contends the court erred both times.

"The applicable law is settled. The Legislature has expressed a preference for joint trials; therefore, two or more defendants jointly charged with crimes must be tried together unless the court orders separate trials. (Pen. Code, § 1098; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 378.) Joint trials promote efficiency and help avoid inconsistent verdicts. (*Zafiro v. United States* (1993) 506 U.S. 534, 537; *Bryant, Smith and Wheeler*, at pp. 378-379.) '[I]mportant concerns of public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against [the] ensuing charges.' (*Bryant, Smith and Wheeler*, at p. 379.) The court has discretion to order separate trials if there is an incriminating confession, prejudicial association, likely confusion due to evidence on multiple counts, conflicting defenses, or the possibility that a codefendant might provide

10

exonerating testimony at a separate trial. (*Ibid*.) Prejudicial association might exist if 'the characteristics or culpability of one or more defendants [is] such that the jury will find the remaining defendants guilty simply because of their association with a reprehensible person, rather than assessing each defendant's individual guilt of the crimes at issue.' (*Id*. at p. 383.) We review the court's denial of severance for abuse of discretion based on the facts as of the time of the ruling. If the court properly denied severance at the time, the reviewing court may reverse a judgment only if it finds that the joint trial caused gross unfairness that denied due process. (*Id*. at p. 379.)" (*People v. Sánchez* (2016) 63 Cal.4th 411, 463-464.)

We see no abuse of discretion. "Defendant was charged with all of the crimes, making this a 'classic case for a joint trial.' (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 379.)" (*People v. Sánchez*, *supra*, 63 Cal.4th at p. 464.) Virtually no reason existed to try the defendants separately. Because the court ordered a separate jury for Huhn, no incriminating confession was admitted against defendant. The court had discretion to conclude defendant would not be prejudiced by association with the codefendants, whom the evidence showed were less culpable than defendant. Because defendant was charged with all counts, there was no possibility of confusion due to evidence on multiple counts. No indication exists that any codefendant would have provided exonerating testimony at a separate trial.

Defendant argues that Lee's defense—that Lee was not one of the conspirators—conflicted with his defense. He notes that the trial court granted a motion for acquittal of the conspiracy charge that Lee made, and claims the ruling was erroneous and prejudiced him. We need not decide whether the trial court correctly acquitted Lee of the conspiracy charge. Lee's defense was different than defendant's, but not antagonistic in a way that prejudiced him. Contrary to

11

defendant's argument, the jury's acceptance of Lee's defense would not preclude it from acquitting defendant. The jury could easily judge Lee's guilt and defendant's guilt separately.

Handshoe later pleaded guilty and testified against defendant under circumstances discussed in part II.A.5., *post*. Defendant argues that Handshoe's transition from a codefendant to a prosecution witness also made the denial of the severance motions erroneous. We disagree. The possibility that a codefendant might later plead guilty—a possibility that always exists when multiple defendants are charged together—is not one of the factors a court must consider in ruling on a severance motion. If a codefendant pleads guilty in a way that harms another defendant, that defendant may make appropriate motions at that time, and an appellate court may review any resulting rulings. Indeed, defendant does raise on appeal various arguments regarding Handshoe's change of plea. We consider those arguments below. (Pt. II.A.5., *post*.)

Denial of severance did not violate any federal constitutional right. As the United States Supreme Court recently explained, trying defendants together, and allowing the jury to decide based on all the evidence, can increase the reliability of the resultant verdict. "Joint proceedings are not only permissible but are often preferable when the joined defendants' criminal conduct arises out of a single chain of events. Joint trial may enable a jury 'to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant . . . .' " (*Kansas v. Carr* (2016) 577 U.S. __, __ [136 S.Ct. 633, 645]; see *People v. Sánchez, supra*, 63 Cal.4th at pp. 465-466.)

"In short, the joint trial was not unfair to defendant at all, much less grossly unfair. The court acted within its discretion in implementing the legislative preference for conducting joint trials." (*People v. Sánchez*, *supra*, 63 Cal.4th at p. 466.)

12

## 2. *Denial of Motion to Sever Counts*

Defendant moved to sever the burglary counts from the counts concerning the Brucker crimes. The court denied the motion. Defendant contends the court erred.

The law prefers trying charged offenses together because doing so ordinarily promotes efficiency. (*People v. O'Malley* (2016) 62 Cal.4th 944, 967.) Penal Code section 954 embodies this preference. That section provides as relevant: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts . . . ." (Pen. Code, § 954.) "Offenses 'committed at different times and places against different victims are nevertheless "connected together in their commission" when they are . . . linked by a " 'common element of substantial importance.' " ' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 160.) The two burglaries and the Brucker crimes "all involved the intent to illegally obtain property," which constitutes a common element of substantial importance that makes joinder proper. (*Ibid*.; see *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1219.)

Even if, as here, joinder is proper, the court may order the counts tried separately. "[T]he court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." (Pen. Code, § 954.) "When, as here, the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion." (*People v. Mendoza*, *supra*, 24 Cal.4th at p. 160.) "In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors: (1)

13

whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case." (*People v. O'Malley*, *supra*, 62 Cal.4th at p. 968.)

We see no abuse of discretion. The trial court carefully considered each of these factors when it exercised its discretion. Cross-admissibility is not "a precondition to joinder of charges." (*People v. O'Malley*, *supra*, 62 Cal.4th at p. 968, citing Pen. Code, § 954.1.) But, as the trial court found, it exists here to a "limited" extent. The court did not find cross-admissibility to show identity. "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.) The court did not find the burglaries sufficiently distinctive to show identity under this standard.

But the court correctly found that the three incidents (the Bell burglary, the Dolan burglary, and the Brucker crimes) were mutually relevant on the question of intent. The least degree of similarity is required to prove intent. All that is needed is for the crimes to be sufficiently similar to support an inference that the defendant probably had the same intent each time. (*People v. Soper* (2009) 45 Cal.4th 759, 776.) Here, evidence that defendant stole property during the daytime Bell and Dolan burglaries supported an inference that he had a similar intent at the Brucker home. The crimes were also relevant to show a common plan

14

or scheme. "To establish the existence of a common plan or scheme, 'the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual.' " (*People v. Avila* (2006) 38 Cal.4th 491, 586; accord, *People v. Capistrano* (2014) 59 Cal.4th 830, 849.) The jury could reasonably conclude that the three incidents were not merely a series of spontaneous acts but part of a plan to steal property repeatedly during daytime burglaries. Additionally, evidence that defendant used his Bronco in the Dolan burglary was relevant to show that the Bronco the witnesses saw at the time of the Brucker crimes was likely defendant's. It may have been mere coincidence that a Bronco was used in the two burglaries five days apart, but, together with the rest of the evidence, the jury could reasonably conclude otherwise.

The Bell and Dolan burglaries were not likely to inflame the jury regarding the Brucker crimes. Although the Brucker crimes were far more serious than the other burglaries, given the strength of the evidence regarding those burglaries, this circumstance did not compel severance.

This is not a matter of joining a weak case with a stronger one. The evidence that defendant participated in all three incidents was strong. He left his cell phone in the Bell home and property from that burglary was found in his home, albeit in Stevens's bedroom. Credit cards in defendant's name were in the stolen jewelry box. Additionally, defendant later left a voicemail message saying the items were his and challenging the authorities to "come and get" him. Defendant's Bronco was involved in the Dolan burglary, he gave a ring stolen in that burglary to his girlfriend's mother, and he possessed a gun stolen in that burglary when arrested in Oregon. Defendant's participation in the Brucker crimes was shown by strong evidence, including the testimony of Zachary Paulson, Brandon Handshoe, and Valerie Peretti; the testimony of various

15

witnesses who saw a Bronco generally similar to defendant's in the area of the Brucker crimes; and Brucker's description of the shooter, which generally matched defendant and made clear that the shooter was the older of the two who came to the door. Defendant was the older man by far.

This is a capital case. But that circumstance merely means the court had to carefully exercise its discretion to avoid prejudicing defendant. It does not automatically require severance. "Even where the People present capital charges, joinder is proper so long as evidence of each charge is so strong that consolidation is unlikely to affect the verdict." (*People v. Ochoa* (2001) 26 Cal.4th 398, 423; accord, *People v. O'Malley*, *supra*, 62 Cal.4th at p. 969.) The court acted reasonably in finding that consolidation was not likely to affect the verdict.

For these reasons, we also reject defendant's argument that joinder was so unfair as to violate his federal constitutional rights. The trial court properly permitted the counts to be tried together.

### 3. *Defendant's* Pitchess *Motion*

Before trial, defendant made a *Pitchess* motion (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531) to discover past complaints concerning Investigator Steven Baker that related to dishonesty or other misconduct. The court found defendant showed good cause for discovery and ordered an in camera review with the custodian of records in the absence of the prosecutor and defense. After conducting the hearing, in open court, the court announced to the parties, "The view has been conducted. No documents are being ordered released."

"When a defendant shows good cause for the discovery of information in an officer's personnel records, the trial court must examine the records in camera to determine if any information should be disclosed. . . . *Pitchess* rulings are reviewed for abuse of discretion." (*People v. Winbush* (2017) 2 Cal.5th 402, 424.)

16

"[T]o protect the officer's privacy, the examination of documents and questioning of the custodian should be done in camera . . . , and the transcript of the in camera hearing and all copies of the documents should be sealed." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229.)  The trial court did this.  Defendant properly asks us to review the sealed record of the in camera hearing to determine whether the court erroneously failed to provide discovery that he should have received.  (*Id*. at pp. 1229-1230.)

We have done so.  The trial court did not abuse its discretion.  It questioned the custodian of records carefully to ensure that she had conducted a thorough search and brought to court all relevant records.  It then correctly found there were no materials to disclose.

### 4. Admission of Evidence of the Events in Oregon

Before trial, defendant moved to exclude evidence of his flight to Oregon and his plans to escape from custody.  After a hearing, the court denied the motion.  Citing *People v. Pensinger* (1991) 52 Cal.3d 1210 and *People v. Remiro* (1979) 89 Cal.App.3d 809, it found the proffered evidence probative to show consciousness of guilt and not unduly prejudicial under Evidence Code section 352.  Defendant contends the court erred.

Evidence showing consciousness of guilt, such as flight or escaping from jail, is generally admissible within the trial court's discretion.  The court's ruling is reviewed for abuse of discretion.  (*People v. Jones* (2017) 3 Cal.5th 583, 609-610; *People v. Carrasco* (2014) 59 Cal.4th 924, 962-963.)  Defendant argues the court abused its discretion because the consciousness of guilt might have been unrelated to the Brucker crimes.  He notes, for example, that he told Charlene Hause that he was leaving because of a parole violation.  Therefore, he argues, the evidence does

17

not necessarily show consciousness of guilt of the charged crimes. We see no abuse of discretion.

As indicated in the cases the trial court cited, the existence of alternate explanations for the defendant's behavior does not necessarily defeat the court's discretion to admit consciousness-of-guilt evidence. (*People v. Pensinger*, *supra*, 52 Cal.3d at pp. 1243-1244 [instruction on flight as showing consciousness of guilt permissible even though there was a possible innocent explanation for his actions]; *People v. Remiro*, *supra*, 89 Cal.App.3d at p. 845 [evidence of an escape attempt admissible despite the possibility the consciousness of guilt might be ascribed to a different crime].) As stated in one of the cases cited in *Remiro*, "the existence of explanations—other than consciousness of guilt of the crime charged—for conduct which may be interpreted as flight is relevant to the *weight* of the evidence showing flight, but *not* to its admissibility . . . ." (*People v. Perry* (1972) 7 Cal.3d 756, 773-774.)

Defendant told Hause he was driving the white truck "because they knew his Bronco," which supports the inference that he drove that truck to Oregon due to the murder in which he had used the Bronco. The jury could readily find that he mentioned a parole violation to Hause, rather than the murder, for the simple reason that he did not want to tell her he was implicated in the murder. Defendant was entitled to argue, or present evidence, that he fled to Oregon and planned to escape due to his parole status or any other reason. But, in light of all the evidence, the jury could reasonably infer he drove the white truck and went to Oregon to avoid the murder charge, which shows consciousness of guilt.

Defendant argues further that even if the evidence of his flight to Oregon was admissible, the court abused its discretion is admitting the details of his escape plans and the items found in his truck, on his person, and in his cell. But the evidence was all part of defendant's conduct showing a consciousness of guilt.

18

The evidence was admissible "to permit the jury to assess the effect and value of the evidence on the issue of consciousness of guilt." (*People v. Remiro*, *supra*, 89 Cal.App.3d at p. 845.)  The exact nature of defendant's actions was highly relevant to whether he merely acted because of a parole violation or because of something more serious, such as murder.  Unlike the situation in *People v. Carrasco*, *supra*, 59 Cal.4th at page 963, defendant's plans to escape included the possibility of violence against the guards.  But under the circumstances, the court had discretion to admit all the evidence.

Defendant argues that the alleged error was prejudicial regarding guilt and, especially, regarding penalty.  Because the court did not err, we need not consider the question.  He also argues that, at a minimum, the jury should not have been allowed to consider the evidence in its penalty deliberations.  The penalty jury was permitted to consider the evidence for the reasons it was admitted at the guilt phase.  " 'So long as it considered the evidence offered at the guilt phase of trial solely for [the purpose it was offered], the jury was entitled to take into account all of the evidence offered at the guilt phase as part of the "circumstances of the crime," an aggravating factor that the jury may consider in its penalty deliberations.  ([Pen. Code,] § 190.3, factor (a).)' (*People v. Champion* (1995) 9 Cal.4th 879, 947.)  'Factor (a) of [Penal Code] section 190.3 allows the prosecutor and defense counsel to present to the penalty phase jury evidence of all relevant aggravating and mitigating matters "including but not limited to, *the nature and circumstances of the present offense*, . . . and the defendant's *character*, background, history, *mental condition* and physical condition." ' (*People v. Guerra* (2006) 37 Cal.4th 1067, 1154, some italics added.)  The evidence may be relevant 'under [Penal Code] section 190.3, factor (a), to the extent that [it] gives rise to reasonable inferences concerning the circumstances of the crime and

defendant's culpability.' (*People v. Riggs* (2008) 44 Cal.4th 248, 321-322.)" (*People v. Cordova* (2015) 62 Cal.4th 104, 140-141.)

Additionally, at least some of the evidence might have been independently admissible as aggravating evidence at the penalty phase. For example, the evidence that defendant conspired to commit a forcible escape might have been admissible as evidence of criminal activity involving the threat to use force or violence under Penal Code section 190.3, factor (b). But even if some or all of the evidence was "aggravating evidence of a type not statutorily authorized" (*People v. Champion*, *supra*, 9 Cal.4th at p. 947), defendant cannot show error. "If defendants had requested the trial court to instruct the jury that it could consider this evidence only for the light it shed on defendants' guilt, such an instruction would perhaps have been appropriate. Defendants, however, did not request such an instruction, and the trial court was not obligated to give such an instruction on its own initiative." (*Ibid.*; see *People v. Barnett* (1998) 17 Cal.4th 1044, 1168.) Defendant did not request such an instruction.

In any event, the events in Oregon were minor compared to the other evidence in aggravation. The penalty determination did not turn on whether the jury improperly considered any of that evidence in aggravation for purposes other than that for which it had been offered at the guilt phase.

### 5. *Issues Regarding Handshoe's Change of Plea and Testimony*

Brandon Handshoe, originally a codefendant, pleaded guilty during jury selection to reduced charges pursuant to a plea bargain and testified against defendant. Defendant raises several arguments regarding these circumstances.

### a. *Factual Background*

On April 11, 2005 (all further dates in this discussion of the factual background are to the year 2005), Handshoe made a "free talk" with the

20

prosecution.[2]  At some point after the talk, the prosecution offered him a plea bargain that he rejected.  On May 2, the prosecution provided the court with a transcript of the free talk and, around that time, the prosecutor and Handshoe's attorney made a joint request to the court that, as the court later characterized it, "the transcript not be released because it was not exculpatory and the deal had fallen through" and because of "safety issues."  The court did not rule on the request at that time.

Jury selection began on May 6, then was continued to May 11, when voir dire began.  Handshoe's counsel participated in the jury selection process on those days.  On May 11, after jury selection had ended for the day, Handshoe pleaded guilty and agreed to testify against defendant.  At that time, the court had not yet ruled on the joint request from the prosecutor and Handshoe's attorney not to disclose the free talk.  The prosecutor provided defendant a transcript of the free talk the next morning, May 12.

Defendant moved for a mistrial or a continuance due to what he called the "unfair surprise" of Handshoe's change of plea.  The court denied both motions on May 17.  Opening statements in the case began on May 23.  Handshoe testified on June 3.

When Handshoe pleaded guilty and agreed to testify, he and the prosecutor entered into a signed, written plea agreement.  The agreement specified the exact terms of the plea bargain and stated that Handshoe would be sentenced to state prison for a total of 17 years.  Additionally, it provided as follows:

---

[2]  "As used here, it appears that a 'free talk' is a statement about the crime that a criminal defendant provides to the prosecutor or investigators (or both), in defense counsel's presence, with the aim of possibly leading to a plea bargain and the defendant's testifying against a codefendant." (*People v. Rices* (2017) 4 Cal.5th 49, 82.)

"Defendant [i.e., Handshoe] agrees that he will cooperate by providing information to law enforcement officers and by testifying in any and all proceeding relating to Eric Anderson, Apollo Huhn and Randy Lee, including but not limited to the April 14, 2003 murder of Stephen Brucker and any other criminal matter filed against the above-listed defendants.

"On April 11, 2005 [Handshoe] gave a taped statement to investigators regarding his knowledge of the circumstances surrounding the attempted robbery/burglary and murder of Stephen Brucker. [Handshoe] confirms that his statement is true and accurate as to his observations, his actions, and the actions of Eric Anderson, Apollo Huhn and Randy Lee. [Handshoe] agrees to submit to subsequent interviews if deemed necessary.

"Overriding all else, it is understood that this agreement extracts from Brandon Handshoe an obligation to do nothing more other than to plead guilty to the listed crimes and to tell the truth. **At all times [Handshoe] shall tell the truth, and nothing other than the truth, both during the investigation and on the witness stand. [Handshoe] shall tell the truth no matter who asks the questions—investigators, prosecutors, judges or defense attorneys.** It is further understood that [Handshoe] shall lose the benefits of this agreement for any intentional deviation from the truth, and if a false statement occurs while he is on the witness stand, he shall be subjected to prosecution for perjury.

"This agreement is automatically voided if Brandon Handshoe violates his obligation to tell the truth or refuses to testify in any grand jury or court proceeding. However, everything [Handshoe] has told law enforcement officers after the commencement of this agreement can be used against him." (Boldface in original.)

The agreement added that Handshoe had read it, discussed it with his attorney, understood its terms, and voluntarily accepted them. It concluded: "I

22

[Handshoe] agree to testify at all grand jury and court proceedings in exchange for the benefit which I am going to receive pursuant to this agreement."

Defendant moved to exclude Handshoe's testimony on the ground that the agreement to testify improperly coerced him into testifying in a particular fashion. After a hearing, the court denied the motion.

### b. Analysis

Defendant contends the prosecutor committed misconduct by not providing timely discovery of the free talk. He did not object in the trial court on this ground. Indeed, his attorney told the court he was not arguing there was a discovery violation, and that he understood why the prosecutor did not provide the discovery until Handshoe pleaded guilty. Accordingly, defendant has forfeited a claim of misconduct. (*People v. Sànchez*, *supra*, 63 Cal.4th at p. 475; *People v. Banks* (2014) 59 Cal.4th 1113, 1193.) Defendant did, however, move for a mistrial or a continuance due to Handshoe's change of plea and the late discovery. The court's denial of those motions is reviewable. Moreover, as we explain, we see no misconduct or discovery violation, and no error in denying a mistrial or continuance.

"Normally, the prosecution must disclose to the defendant statements of other defendants. (Pen. Code, § 1054.1.) However, the prosecutor moved the court, pursuant to Penal Code section 1054.7, for permission not to provide discovery of the free talk . . . ." (*People v. Rices*, *supra*, 4 Cal.5th at p. 83.) "Penal Code section 1054.7 provides that disclosure may be 'denied, restricted, or deferred' if 'good cause is shown.' ' "Good cause" is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement.' (*Ibid*.)" (*Id*. at p. 83, fn. 3.) "As the prosecutor represented to the court in his

23

motion not to provide the discovery, nothing in the free talk was favorable to defendant.  Accordingly, there was no error under *Brady v. Maryland* [(1963)] 373 U.S. 83 (concerning the prosecutor's duty to disclose exculpatory evidence)." (*Id.* at p. 84.)

Defendant claims the free talk was exculpatory in that it contained statements relevant to Handshoe's credibility.  But the talk contained nothing suggesting defendant's innocence.  To the extent it contained something that might undermine Handshoe's credibility, it became relevant only when Handshoe became a prosecution witness, at which time the prosecution promptly provided it.

It was reasonable for the prosecutor not to disclose the free talk as long as Handshoe was not likely to testify and the trial court had not ruled on the joint motion to withhold the discovery.  Here, unlike the situation in *People v. Rices*, *supra*, 4 Cal.5th at page 84, the prosecutor provided discovery of the free talk promptly after Handshoe pleaded guilty, that is, as soon as it became apparent he would become a witness.  In *Rices*, we assumed error in not providing the discovery once it became apparent the codefendant would become a witness. (*Ibid*.)  Here, the prosecutor did provide the discovery.  We believe the discovery was timely under the circumstances.  As discussed below, we also see no prejudice.  "A violation of [Penal Code] section 1054.1 is subject to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836." (*People v. Verdugo* (2010) 50 Cal.4th 263, 280.)

Defendant did move for a mistrial and a continuance due to these circumstances.  To the extent defendant contends the court erred in denying those motions, we disagree.  No doubt defendant was surprised when Handshoe changed from a codefendant to a prosecution witness.  But that happens sometimes.  Criminal defendants, occasionally including codefendants, sometimes accept a

24

plea offer and plead guilty at the last moment, when actually faced with an imminent trial. We see nothing prejudicial that required a mistrial.

Relying on two Florida cases, defendant argues he was prejudiced by the fact that Handshoe's attorney participated in the beginning of jury selection. In *Kritzman v. State* (Fla. 1988) 520 So.2d 568, a codefendant pleaded guilty and agreed to testify against the remaining defendant. Even after the guilty plea, the codefendant "was permitted to participate in the jury selection, for purposes of the sentencing phase of his trial." (*Id*. at p. 569.) The court found that "[a]llowing the state's star witness to participate in picking the jury that would eventually determine Kritzman's guilt and punishment" was reversible error. (*Id*. at p. 570.) It noted that the procedure "permitted the state's chief witness to excuse jurors who would be prone to disbelieving his story, which implicates Kritzman"; doing so "deprived Kritzman of the ability to fairly choose jurors, free of this type of interference from" the former codefendant. (*Ibid*.) Similarly, in *Allen v. State* (Fla.Dist.Ct.App. 1990) 566 So.2d 892, a codefendant participated in the entire jury selection process, striking two jurors whom the remaining defendant had accepted; then, *after* the jury had been sworn, the codefendant pleaded guilty and became a prosecution witness. Relying on *Kritzman*, the court found reversible error because the defendant "was tried before a jury partially chosen by a former codefendant testifying for the state." (*Id*. at p. 893.)

This case is different. Handshoe's attorney participated in the beginning of the jury selection process, including one day of voir dire. But he was not involved in actually choosing the jurors. As soon as Handshoe pleaded guilty, well before the jury was selected, his attorney stopped participating in the trial. The trial court could reasonably conclude that the jury would have no difficulty understanding that Handshoe, although originally a codefendant, had pleaded guilty, and that

25

defendant therefore suffered no prejudice. The court acted within its discretion in denying the mistrial motion. (*People v. Harris* (2013) 57 Cal.4th 804, 848.)

The court also acted within its discretion in denying a continuance. "[T]he decision whether or not to grant a continuance of a matter rests within the sound discretion of the trial court. [Citations.] The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked." (*People v. Beames* (2007) 40 Cal.4th 907, 920.)

When the court and the parties discussed whether a continuance was needed, the prosecutor informed the court that he would probably call Handshoe as a witness at the end of his case. In fact, Handshoe did not testify until June 3, some three weeks after defendant received discovery of the free talk and became aware that Handshoe would testify. The prosecutor made no use of the free talk, although defendant himself asked Handshoe about it on cross-examination to show his interest in obtaining as favorable a plea offer as possible. Nothing in the record suggests that three weeks was an inadequate amount of time for defendant to prepare for Handshoe's testimony. The court acted within its discretion in denying a continuance.

Defendant also argues that the plea agreement improperly coerced him into testifying in a particular fashion.

"[A] defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion." (*People v. Medina* (1974) 41 Cal.App.3d 438, 455; accord, *People v. Homick* (2012) 55 Cal.4th 816, 862.) Because of this, "[i]mmunity or plea agreements may not properly place the accomplice under a strong compulsion to testify in a particular manner—a requirement that he or she testify in conformity

26

with an earlier statement to the police, for example, or that the testimony result in defendant's conviction, would place the witness under compulsion inconsistent with the defendant's right to fair trial." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1010.) "[W]e review the record and reach an independent judgment whether the agreement under which the witnesses testified was coercive and whether defendant was deprived of a fair trial by the introduction of the testimony, keeping in mind that generally we resolve factual conflicts in favor of the judgment below." (*Ibid.*)

Defendant contends Handshoe's agreement was improperly coercive under this standard. However, as the bold print in the agreement emphasized, the agreement required Handshoe to do nothing more than testify truthfully. "Although we have recognized that there is some compulsion inherent in any plea agreement or grant of immunity, we have concluded that 'it is clear that an agreement requiring only that the witness testify fully and truthfully is valid.' [Citations.] Such a plea agreement, even if it is clear the prosecutor believes the witness's prior statement to the police is the truth, and deviation from that statement in testimony may result in the withdrawal of the plea offer, does not place such compulsion upon the witness as to violate the defendant's right to a fair trial." (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 1010.) The agreement is not improperly coercive unless it "is expressly contingent on the witness sticking to a particular version . . . ." (*People v. Garrison* (1989) 47 Cal.3d 746, 771; accord, *People v. Homick*, *supra*, 55 Cal.4th at p. 862.)

In the agreement, Handshoe confirmed that his previous statement was true. But this provision did not make the agreement impermissibly coercive. Nothing in the agreement indicated that it would be violated if Handshoe were to testify truthfully yet contradict an aspect of his prior statement. "These principles are violated only when the agreement requires the witness to testify to prior statements 'regardless of their truth,' but not when the truthfulness of those statements is the

27

mutually shared understanding of the witness and the prosecution as the basis for the plea bargain." (*People v. Homick*, *supra*, 55 Cal.4th at p. 863, citing *People v. Boyer* (2006) 38 Cal.4th 412, 456.)

In *Boyer*, "the agreement stated, '*the witness has represented* that [his] testimony . . . will be in substance' " consistent with his prior taped statements. (*People v. Boyer*, *supra*, 38 Cal.4th at p. 455.) We found this provision not improperly coercive. "The grant of immunity to Kennedy [the witness], by its terms, was based on his truthful testimony, which Kennedy himself 'represented' would be in accordance with his prior statements. Thus, the agreement simply reflected the parties' mutual understanding that the prior statements *were* the truth, not that Kennedy must testify consistently with those statements regardless of their truth." (*Id*. at p. 456.) The agreement here was similar.

The agreement also informed Handshoe that if he intentionally lied, the agreement would be nullified and he (like any witness) could be prosecuted for perjury. But this language "simply spells out the consequences present in every plea agreement conditioned on the witness testifying truthfully; it does not amount to *Medina* error." (*People v. Homick*, *supra*, 55 Cal.4th at p. 863.)

Accordingly, the trial court correctly permitted Handshoe to testify. Its ruling did not deny defendant a remedy. He had the opportunity to, and did, cross-examine Handshoe effectively regarding the plea agreement and any coercive aspect it may have had. The jury learned about the agreement and the surrounding circumstances and thus could evaluate Handshoe's credibility. (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 1012.) "We conclude that the record does not establish that defendant was denied a fair trial." (*Ibid*.)

28

### 6. *Refusal to Order a Witness to Undergo Drug Testing*

During Valerie Peretti's testimony, at a conference outside the jury's presence, defendant's attorney stated: "I have a concern as to whether Ms. Peretti may be under the influence as she is testifying today. Her demeanor is such that she's constantly leaning, constantly locking her jaw, and is scratching herself. Given what I know of her history, I think it is—it would be quite likely that she is under the influence. And I think if she is, that the jurors would have a right to know about that. So I would ask the court to order that she produce a urine sample." The court denied the request but added, "In terms of cross-examination, if you feel that there is unresponsiveness, you can inquire." Defendant argues the court erred in not requiring the witness to undergo drug testing.

"A witness's drug intoxication may indeed be a basis for impeaching his credibility [citations]; in extreme cases it may render him incompetent to testify [citation]. Defendant must be allowed to explore fully any issue of the witness's competence or credibility by cross-examination, subject to the witness' right against self-incrimination. [Citation.] But defendant has cited no case, nor have we discovered one, which suggests that a criminal accused is entitled on demand to subject a witness to a court-ordered physical intrusion or chemical test to determine whether he is under the influence of an intoxicating substance." (*People v. Melton* (1988) 44 Cal.3d 713, 737.) Witnesses, as well as criminal defendants, have a constitutional right "to be free from unwarranted bodily intrusions by agents of government." (*Ibid*.) "[N]o intrusion may be ordered on a showing less than probable cause." (*Id*. at p. 738.) Although most of the cases involve criminal suspects, "it is manifest that nonparties have equal rights against unreasonable bodily searches." (*Ibid*.) Accordingly, "[a] defendant's constitutional right to confront a witness does not entitle him to obtain court-ordered evidence in violation of the witness's constitutional rights against

29

unreasonable searches and seizures." (*Ibid*; accord, *People v. Earp* (1999) 20 Cal.4th 826, 882.) Before the court can order a witness to undergo drug testing it must find probable cause to believe doing so will uncover material evidence. (*Earp*, at p. 882.)

We need not decide whether the circumstances would have *permitted* the court to order Peretti to undergo drug testing, for nothing in the record suggests the court was *compelled* to do so. Defense counsel argued for drug testing, but that alone did not compel the court to order it. The judge was present and was in a far better position than this court to determine the necessity and propriety of subjecting the witness to drug testing. But even reviewing the cold record, no reason appears to believe that such testing was warranted, much less required. The witness, 17 years old at the time she testified, was articulate and appeared to have no difficulty understanding and answering the questions. She withstood without apparent difficulty an extraordinarily long and probing cross-examination. As the trial court noted, defense counsel was able to, and did, ask questions regarding her past drug use, which the witness candidly and articulately answered.

This record does not compel a finding of probable cause sufficient to order the witness to undergo drug testing. Accordingly, we see no error.

### 7. *Permitting the Jury To View and Listen to Defendant's Bronco*

Two witnesses who observed the Bronco at the time, and in the area, of the Brucker crimes described it as loud. Accordingly, the prosecutor requested that the jury be allowed to listen to the sound of defendant's Bronco, which had been impounded. Defendant objected, arguing that whether the Bronco was loud was not disputed, and the conditions were not the same at the time of trial as they were at the time of the crimes over two years earlier. The court overruled the objection. It stated that this is "simply a tidbit of circumstantial evidence. It's relevant in

30

terms of there's been testimony that this particular Ford Bronco has some unique characteristics. So, to me, it's similar to any type of eyewitness identification issue." The court observed that defendant could present any evidence he wished explaining that the sound at the time of the trial might be different than at the time of the crimes. But the court "believe[d] that goes to weight, not admissibility." Later, Detective Curt Goldberg stated to the court and the parties that the vehicle would be pulled onto a flatbed truck and towed to the spot where the jury would view it. Defense counsel indicated there might be additional objections.

The next court day, the court held another hearing. Defense counsel reiterated the objection that what she termed an "experiment" would be conducted under different conditions than prevailed at the time of the crimes. The court asked the prosecutor whether he intended to conduct an experiment. He responded that he did not: "The vehicle is simply going to be started so that the jurors have an opportunity to hear the loudness or lack thereof of the vehicle." The court again overruled the objection: "I agree in terms of the logic of what [defense counsel] said that there may in fact be some dissimilarity in terms of the exact condition of the exhaust system, the muffler, today's condition versus April 14th or April 9th and 10th of 2003. But I sense from what's been proposed by the district attorney that they're not trying to establish that the exhaust system is a tenor or a baritone or a bass or anything of that nature. They're trying to establish that it has a problem with the exhaust system, period." It reiterated that defendant could cross-examine witnesses in this regard.

Detective Goldberg testified in front of the jury that he impounded defendant's Bronco on May 13, 2003 and, after searching it for evidence, he stored it at the sheriff's department impound lot in El Cajon, where it had remained until trial. He arranged for it to be brought to the area of the courthouse. On cross-examination, defense counsel established that the vehicle had been towed to the

31

courthouse that day; that it had remained in the open exposed to the elements, including rain, for over two years; and that it had been started twice during that time, the last time on February 17, 2005.

After Detective Goldberg testified, the jury was taken outside to the Bronco's location. Defendant further objected that, because the vehicle was on top of the metal tow truck, the sound would reverberate, making it sound louder than it otherwise would. The court did not change its ruling. At defendant's request, it ruled that the jury could look at the vehicle's muffler. Then the Bronco was started and the jury listened to it.

Defendant contends the court erred in permitting the jury to listen to the Bronco's sound. He argues that, because the circumstances in which the jury heard it were different than those that existed two years earlier, the evidence was irrelevant and, even if relevant, should have been excluded as impermissibly prejudicial under Evidence Code section 352. "The trial court has broad discretion both in determining the relevance of evidence and in assessing whether its prejudicial effect outweighs its probative value." (*People v. Horning* (2004) 34 Cal.4th 871, 900.) We see no abuse of discretion.

The evidence was relevant. It had a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Because witnesses testified that the Bronco seen near the crime scene was loud, evidence that defendant's Bronco was loud tended in reason to prove that his Bronco was the one used in the crime, which, in turn, tended in reason to prove that defendant was involved in the murder, a disputed fact that is of consequence to the determination of defendant's guilt. It also corroborated Matthew Hansen's testimony that defendant's Bronco had a loud sound the day of, and the day after, the Dolan burglary, i.e., four and five days before the Brucker crimes. Defendant argues, in effect, that it was possible the

32

Bronco sounded loud at the time the jury heard it but not at the time of the crimes two years earlier. To the extent that possibility existed—and defendant had full opportunity to present evidence and argument in that regard—it weakened the strength of the evidence; but it did not render it irrelevant. Standing alone, the sound of the Bronco was not particularly strong evidence. But it was, to use the trial court's term, a "tidbit" of circumstantial evidence.

Defendant cites cases involving efforts to admit evidence of the lighting conditions at the time of the crime. (See generally *People v. Jones* (2011) 51 Cal.4th 346, 375-377.) Those cases do not aid defendant. They establish that the decision whether to admit experimental evidence lies within the trial court's discretion. (*Id*. at pp. 375-376.) What occurred here was not an experiment but merely permitting the jury to listen to defendant's actual vehicle. But in any event, the same abuse of discretion standard prevails. Even though it had limited value, the court acted within its discretion in admitting this bit of circumstantial evidence.

### 8. Admitting Northcutt's Hearsay Statement

The prosecution called Travis Northcutt as a witness. His testimony consisted largely of denials of prior statements and claims of lack of memory. The prosecution later called Investigator Baker to testify about statements Northcutt had made to him. He testified that Northcutt told him that defendant had told Northcutt "that something big was going to happen, a big hit that involved a safe." Defendant contends the court erred in admitting this item of evidence because it was inadmissible hearsay and did not qualify as a prior inconsistent statement.

Preliminarily, the Attorney General argues defendant has forfeited the contention because he did not object on hearsay grounds at trial. (Evid. Code, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 433-434.) The prosecutor asked

33

Investigator Baker, "Did [Northcutt] tell you that Eric Anderson had told him that he was coming along and —" At this point defendant's attorney objected on the ground that the question was leading. The prosecutor responded, "It's impeachment." The court ruled, "I think this is a question that was asked of Mr. Northcutt and . . . my ruling is that there is the foundation for prior inconsistent statement." The prosecutor then asked the question that elicited the testimony defendant challenges.

Although defendant objected only on the ground the question was leading, the court anticipated a hearsay objection and ruled on it. The rule requiring an objection on the ground asserted on appeal serves important purposes—including permitting the court to make a reasoned ruling and the proponent of the evidence to cure any defect—but it must also "be interpreted reasonably, not formalistically." (*People v. Partida*, *supra*, 37 Cal.4th at p. 434.) The court's ruling might have forestalled defendant from additionally objecting on hearsay grounds. It did make a reasoned ruling. Under the circumstances, we conclude defendant may challenge the correctness of the court's ruling.

Turning to the merits, the trial court's ruling was correct. The testimony was double hearsay—what Northcutt told the investigator about what defendant told him. But each level of hearsay came within an exception to the hearsay rule, making the statement admissible. (Evid. Code, § 1201; *People v. Zapien* (1993) 4 Cal.4th 929, 951-952.) Defendant's statement to Northcutt came within the exception for statements of a party. (Evid. Code, § 1220; *People v. Horning*, *supra*, 34 Cal.4th at p. 898.) Northcutt's statement to the investigator came within the exception for prior inconsistent statements. (Evid. Code, § 1235; *People v. Rodriguez* (2014) 58 Cal.4th 587, 633.) "[M]ultiple hearsay consisting of a prior inconsistent statement and an admission of the defendant" is admissible. (*Zapien*, at p. 953.)

34

Defendant argues that the statement in question was not inconsistent with Northcutt's trial testimony. Citing part of Northcutt's testimony, he argues that Northcutt said that he did not remember the statement. "Ordinarily, a witness's inability to remember an event is not inconsistent with that witness's prior statement describing the event. [Citation.] When, however, 'a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied.' " (*People v. Rodriguez*, *supra*, 58 Cal.4th at p. 633.) We need not decide whether this and Northcutt's many other claims not to remember (including, for example, his roommate's name and his own address) were evasive within this rule, for the statement in question was clearly inconsistent with other portions of Northcutt's testimony.

Northcutt affirmatively denied that defendant had brought up "the subject of committing a crime involving a safe." During cross-examination, defense counsel asked him "about [defendant] telling you that he was involved in something big and that it involved a safe." Northcutt answered, "That would have never happened." He then reiterated, "It never happened," and "It couldn't possibly, no, no." Northcutt's prior statement was inconsistent with this testimony and, accordingly, the trial court properly admitted it.

Defendant also argues the testimony was not sufficiently trustworthy to be admissible. Trustworthiness is not an element of the hearsay exception for prior inconsistent statements (Evid. Code, § 1235) but, like most kinds of evidence, a matter for the jury to judge. To the extent defendant may be understood to argue that admitting the evidence violated his federal constitutional right to confront witnesses, the claim also lacks merit. In *Crawford v. Washington* (2004) 541 U.S. 36, 59-60, footnote 9, the high court "reiterate[d] that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all

35

on the use of his prior testimonial statements." (See *People v. Rodriguez, supra*, 58 Cal.4th at p. 632.)

### 9. *Admitting Evidence Regarding When Defendant Became a Suspect*

The prosecution presented evidence of defendant's flight to Oregon and escape plans to show consciousness of guilt. (See pt. II.A.4, *ante*.) In response, defendant called Detective Goldberg as a witness and questioned him about a newspaper article in the San Diego Union-Tribune dated April 24, 2003, that contained Goldberg's name. The prosecutor objected on relevance grounds. At a conference outside the jury's hearing, defense counsel argued that "this is the exact date of the parole search. This is the date where the People are alleging that Mr. Anderson fled because he was a suspect in the Brucker homicide. Whereas in fact the suspect information, it is completely different. . . . It is being offered to show the state of the publicity at the time." The court overruled the prosecutor's objection, ruling that the evidence "supports the contention that it was flight for parole reasons rather than being named as a suspect."

Back in the jury's presence, Detective Goldberg testified that the April 24, 2003, article said two women between the ages of 17 to 25 were being sought as suspects in the Brucker homicide, and the suspect vehicle was a gray Toyota "4Runner" or "PreRunner" type of truck. He also testified about another article in the same newspaper dated May 10, 2003, that also referenced himself. He said that by that date, the two women had been cleared, and the investigators were asking the public for more information. The article quoted him as saying that the investigation was "wide open."

On cross-examination, Detective Goldberg testified that defendant first became a suspect through a "crime stopper tip" on April 17, 2003. Defendant objected to the testimony as hearsay. The court overruled the objection, stating it

would "allow it for the limited purpose, not for the truth of the tip, but the timing of the tip and what happened next."

Defendant argues the court erred in permitting this cross-examination of Goldberg because it elicited inadmissible hearsay and violated his federal confrontation rights. However, as the court explained in front of the jury, the testimony was not offered for a hearsay purpose but for the nonhearsay purpose of establishing when defendant became a suspect in the case. (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1162.) This nonhearsay purpose was relevant to counter the testimony defendant elicited on direct examination. "[T]here are no confrontation clause restrictions on the introduction of out-of-court statements for *nonhearsay* purposes." (*People v. Cage* (2007) 40 Cal.4th 965, 975, fn. 6, citing *Crawford v. Washington*, *supra*, 541 U.S. at p. 60, fn. 9.) Contrary to defendant's argument, no reason appears to believe that Detective Goldberg, who investigated the case from the beginning, would not have personal knowledge of when defendant became a suspect. The court properly permitted the testimony for this limited purpose.

### 10. Admission of Evidence of Telephone Data

The prosecution presented telephone records and testimony showing telephone calls among the various participants during relevant times. It obtained the telephone records pursuant to a court order under 18 United States Code section 2703, part of the federal Stored Communications Act. (See *Carpenter v. United States* (June 22, 2018, No. 16-402) 585 U.S. __. __ [2018 WL 3073916 p. *4].) Defendant moved to suppress the evidence, partly on the ground that obtaining the records without a search warrant violated his rights under the Fourth Amendment to the United States Constitution. Citing *Smith v. Maryland* (1979) 442 U.S. 735 (using a telephone company's central offices to track telephone

37

numbers the defendant dialed from his home is not a search under the Fourth Amendment), the trial court found no constitutional violation.

The United States Supreme Court has now held that a search warrant is needed to obtain at least some types of information governed by the Stored Communications Act. (*Carpenter v. United States*, *supra*, 2018 WL 3073916.) The court stressed that its holding is "narrow," and that it did "not disturb the application of" cases such as *Smith v. Maryland*, *supra*, 442 U.S. 735. (*Carpenter*, at p. *13.) It is not clear whether *Carpenter*'s holding would apply here. But we need not decide the question. Any error was harmless beyond a reasonable doubt. The evidence merely showed that some of the alleged conspirators communicated by telephone at certain times; the *content* of the communications was not revealed. Although relevant, the evidence was unimportant in light of the trial as a whole.

### 11. Excluding Defense Evidence

Defendant called as a witness Andrea Finch. She testified that she knew Lee, Huhn, and Handshoe through Ronnie Densford, who had been her boyfriend from 1992-2000. The prosecutor objected to the testimony on relevance grounds, and a hearing ensued outside the jury's presence.

Defendant's attorney made an offer of proof that the witness would testify that Densford was a close friend of Huhn and Handshoe, and Densford's home was a "hangout place" for the group. At Densford's home, "there was access to weapons, specifically large-caliber automatic weapons, there was access to disguises, and there was access to vehicles." Defendant's attorney was not offering the testimony as evidence of third party culpability but "to show that Apollo Huhn and Brandon Handshoe had access to all of the items that have been described as having been used in this particular crime through someone other than Eric Anderson." Although the witness broke up with Densford in 2000, "she

38

continued hanging out at the house until summer 2002."  The court sustained the prosecutor's objection, explaining, "I'm finding as to the probative value of summer '02, a third party exhibiting a firearm has limited probative value and an undue consumption of time."

Defendant contends the court erred in excluding this evidence.  We disagree.  As explained before, "The trial court has broad discretion both in determining the relevance of evidence and in assessing whether its prejudicial effect outweighs its probative value."  (*People v. Horning*, *supra*, 34 Cal.4th at p. 900.)  As the court found, any relevance that Huhn and Handshoe were hanging out at a home where weapons, vehicles, and disguises were present as late as the summer before the April 2003 crimes was tenuous at best.  "The court weighed the arguably slight probative value of" the evidence "against the likelihood that its admission would require an 'undue consumption of time' (Evid. Code, § 352), and soundly determined that the balance justified exclusion."  (*People v. Brooks* (2017) 3 Cal.5th 1, 45.)  There was no error.

### 12. *Impeaching a Defense Witness*

Over defense objection, the court permitted defense witness James Stevens to be impeached with his convictions for "auto theft" in 1986, 1987, 1992, and 1993; for "escape" in 1986; and for "robbery with use of a firearm" in 1996, his last conviction.  He was in prison on the last conviction when he met defendant around 1996-1997.

In overruling defendant's objections, the court found that "Mr. Stevens is not a defendant who can suffer some prejudice in terms of disposition to commit crimes."  Contrary to defendant's argument, it found that escape is a crime involving moral turpitude.  It also found that the firearm use finding regarding the robbery was relevant for impeachment, explaining that "if the firearm was pled

39

and admitted, that constitutes a specific incident of willingness to do evil." It "weigh[ed] [the firearm use finding] pursuant to [Evidence Code section] 352. And my belief is that that is a separate, although it might be a tangent, it is a separate act that would constitute moral turpitude: the use of a weapon in the course of a felony offense." Additionally, in response to defendant's argument that some of the convictions were too remote, it ruled that "the fact that they go back 20 years, I find . . . does not neutralize the probative value of it because it looks like for ten years, up until the 1996 [robbery], it was an uninterrupted sequence of criminal activity."

Defendant contends the court erred in not excluding at least some of the convictions and the firearm use finding. It did not. After the 1982 adoption of article I, section 28, subdivision (f), of the California Constitution, a witness may be impeached with any prior felony conviction involving moral turpitude, subject to the trial court's discretion under Evidence Code section 352 to exclude it if it finds its prejudicial effect substantially outweighs its probative value. (*People v. Clair* (1992) 2 Cal.4th 629, 653-654.) The court's ruling is reviewed for abuse of discretion. (*Id.* at p. 655.) Because this discretion is broad, "a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*People v. Clark* (2011) 52 Cal.4th 856, 932.)

The court did not abuse its discretion. As it noted, because Stevens was not a defendant, there was no reason to be concerned that the jury might improperly consider the convictions as showing a propensity to commit crimes. This circumstance greatly reduces the danger of undue prejudice. The main factors for the court to consider when the witness is not a defendant are "whether the conviction (1) reflects on honesty and (2) is near in time." (*People v. Clair, supra*, 2 Cal.4th at p. 654.)

40

Contrary to defendant's argument at trial, escape, even without force, involves moral turpitude. (*People v. Lang* (1989) 49 Cal.3d 991, 1009-1010.) Any "[m]isconduct involving moral turpitude may suggest a willingness to lie . . . ." (*People v. Wheeler* (1992) 4 Cal.4th 284, 295.) The early convictions were somewhat remote in time, but because the witness continued to commit crimes for many years thereafter, and then was incarcerated, limiting his ability to commit more crimes, the court reasonably admitted them. (*People v. Turner* (1994) 8 Cal.4th 137, 200.) "Even a fairly remote prior conviction is admissible if the defendant has not led a legally blameless life since the time of the remote prior." (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925-926.) The fact that the witness had so many convictions did not compel the court to exclude any of them. "[A] series of crimes may be more probative of credibility than a single crime." (*People v. Clark*, *supra*, 52 Cal.4th at p. 932.) Finally, the firearm use finding was part of the robbery conviction. The fact that Stevens went so far as to use a firearm to steal was also relevant to whether he might lie to help defendant. The court acted within its discretion in admitting the convictions.

### 13. Trial Court's Response to a Juror's Question

During a break in Valerie Peretti's testimony, the court received a note from one of the jurors asking, "Can I figure a person's attitude and demeanor outside of the courtroom, i.e., specific witness actions in court's main area outside of main entrance?"

At a hearing held outside the rest of the jury, the court told the juror that the "short answer is no. The instructions that I gave in terms of demeanor means demeanor while testifying." When questioned, the juror said, "I saw a witness [later identified as Peretti] that at least — we were down in the common area, and you see everybody. And a witness was, what I would say, in a much more joyous

41

and, you know, very high levity than what I would expect of somebody who is in this kind of magnitude of a case." He also said that two other jurors on the same panel also observed the same behavior. The three jurors discussed that "that doesn't seem, you know, the same demeanor that they should have, and that's where we left it." They wondered whether they could "weigh it or not." After the juror left the courtroom, two of the defense attorneys said they observed Peretti apparently trying to make eye contact with the jurors as they walked by and smiling at them. The court agreed to admonish Peretti not to do so and to admonish the jury.

The court then instructed the jury that "it is important to recognize that a witness is allowed to communicate with a trial juror only through the question and answer procedure. The taking of testimony in the courtroom." It told the jurors to inform the court if anyone felt a witness was trying to communicate in other ways. Repeating portions of CALJIC Nos. 1.00, 2.00, and 2.20, that it had given at the outset of trial, it also reiterated that "you must determine the facts in this case from the evidence received in this trial and not from any other source. Evidence means testimony, writings, material objects, or anything presented to the senses that are offered to prove the existence or nonexistence of a fact. In determining the credibility of a witness, you may consider the demeanor of the witness while testifying and the manner in which the witness testifies."

Later, outside the jury's presence, defense counsel asked the court to instruct the jury that it "can consider the demeanor of the witness present in the courthouse for the purpose of testifying." The court declined to so instruct. It noted that not all the jurors might have seen what one juror saw. Additionally, it noted that all parties had agreed the court should instruct, pursuant to CALJIC No. 1.00, that the jury "must determine what facts have been proved from the evidence

42

received in the trial and not from any other source." The court did not "believe that definition of trial extends to the hallway or the patio."

Defendant contends the court erred. He appears not to argue now what his attorneys argued at trial—that the jury should be allowed to consider a witness's demeanor *outside* the courtroom. The trial court was correct in this regard. "[T]he jury is to determine the effect and value of the *evidence addressed to it . . . .*" (Evid. Code, § 312, subd. (b), italics added.) What a witness might or might not do outside the courtroom is not part of the evidence presented to the jury. Thus, CALJIC No. 1.00 correctly informs the jury it may consider only "evidence received in the trial." To make the proceeding fair to all, evidence is presented in controlled circumstances within the courtroom (or, occasionally, outside the courtroom, as when the jury in this case listened to the sound of defendant's Bronco, but still under controlled circumstances) so that all jurors can observe and hear the evidence together. Trying to draw meaning from what one or more jurors, but not all, might observe outside the courtroom can be misleading. As CALCRIM No. 101 (not given in this trial) explains, "It is unfair to the parties if you receive additional information from any other source because that information may be unreliable or irrelevant and the parties will not have had the opportunity to examine and respond to it."

Defendant argues instead that the court did not directly answer what he calls the "jury's question" regarding whether a juror may consider demeanor outside the courtroom. However, the *jury* did not ask the question; a single juror did. And the court answered that question quite directly and entirely correctly: "[N]o."

The court also correctly reiterated other instructions to ensure the entire jury understood its duty. Defendant argues those instruction limited the jury's ability to consider the witness's demeanor in the courtroom when that witness is

43

*not* testifying. It is not clear, but, apparently, defendant claims the court improperly precluded the jury from considering the witness's demeanor while exiting the courtroom after testifying (or perhaps while approaching the witness chair before testifying). This was not defendant's concern at trial. The argument is basically an attack on CALJIC No. 2.20, which instructs the jury that it may consider "[t]he demeanor and manner of the witness while testifying." (See also CALCRIM No. 105 [the jury may consider "the witness's behavior while testifying"].) As the Attorney General observes, "Because witnesses necessarily testify inside the courtroom, jurors would have had no reason to think they could not rely on their observations of witnesses inside the courtroom in assessing their credibility." We see no error in the court's reiteration of this portion of CALJIC No. 2.20 or in any other part of its response to the juror's question.

### 14. *Instructing the Jury Regarding Accomplices*

The court instructed the jury that the testimony of an accomplice must be corroborated. It also instructed that Brandon Handshoe was an accomplice as a matter of law. However, it rejected defendant's request to instruct the jury that Valerie Peretti and Zachary Paulson were also accomplices as a matter of law. It said the parties could argue the point to the jury, but it found the evidence in dispute as to whether either of those witnesses was an accomplice. Accordingly, it instructed the jury that it had to determine whether Peretti or Paulson were accomplices.

"In California, '[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . .' ([Pen. Code,] § 1111.) For purposes of this rule, an 'accomplice' is 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the

44

cause in which the testimony of the accomplice is given.' (*Ibid*.) 'This definition encompasses all principals to the crime [citation], including aiders and abettors and coconspirators. [Citation.]' . . . [L]iability as an aider and abettor requires proof that the person in question 'aid[ed] or promote[d] the perpetrator's crime with knowledge of the perpetrator's unlawful purpose and an intent to assist in the commission of the target crime.' . . . [W]hether a witness is an accomplice is a question of fact for the jury unless no reasonable dispute exists as to the facts or the inferences to be drawn from them." (*People v. Manibusan* (2013) 58 Cal.4th 40, 93.) "The *court's* task was not to determine whether the jury *could* reasonably find [the witness] was an accomplice, but rather whether it could *only* reasonably find that he was an accomplice." (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 430.)

Defendant contends the court erred in refusing to instruct the jury that Peretti and Paulson were accomplices as a matter of law. However, the trial court was correct that the facts or the inferences to be drawn from them were reasonably disputable as to both witnesses. In fact, little evidence existed that either was an accomplice. As defendant notes, both were present when the conspiracy was discussed. This presence might establish that they *knew* of the conspiracy. But it does not establish beyond reasonable dispute that either did anything to further the conspiracy or did so with the required *intent*.

Peretti was Huhn's 15-year-old, pregnant girlfriend. Her testimony suggested her presence at the April 14, 2003, meeting was accidental, and, indeed, unwanted. No evidence exists to suggest that she participated in substantive discussions regarding the planned robbery. She did testify that she said they would "go shopping" with the money, but that alone does not establish accomplice liability as a matter of law. She also testified that she told Huhn she did not want him to go to the planned robbery.

45

Similarly, little or no evidence exists to suggest that Paulson did anything to further the conspiracy or had the requisite intent—and certainly none that establishes these elements beyond dispute. "On this record, it was for the trier of fact to decide whether [either witness] had the intent necessary to establish that [either] was an accomplice." (*People v. Manibusan*, *supra*, 58 Cal.4th at p. 94.) The court properly refused to instruct the jury that either was an accomplice as a matter of law.

Moreover, any error would have been harmless. "Error of the kind he alleges is harmless if the record contains 'sufficient corroborating evidence.' [Citation.] 'Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." ' " (*People v. Manibusan*, *supra*, 58 Cal.4th at p. 95.)

Contrary to defendant's additional argument, even if we were to assume that both Peretti and Paulson were accomplices, ample evidence corroborated their testimony. The evidence that defendant drove a loud Bronco during the Dolan burglary four days before the Brucker crimes, combined with the evidence that numerous witnesses observed a generally similar Bronco near the Brucker crime scene, which two also said was loud, tended to connect him to the crime. So did Charlene Hause's testimony that defendant told her that he was using the white truck "because they knew his Bronco." Additionally, Travis Northcutt's statements about what defendant told him, including that a "big hit" involving a safe was going to happen, connected defendant to the crime.

46

### 15. Instructing the Jury on Accessories

In her argument to the jury, defense counsel argued that Peretti was an accomplice. In part, she cited actions *after* the Brucker crimes, including her failure to report promptly what she knew, the "lies" she told about "her boyfriend's involvement," and the fact she was given immunity for her testimony. Counsel said, "This is a girl who was definitely an accomplice to the crime."

After this argument, outside the jury's presence, the prosecutor asked the court to instruct the jury on liability as an accessory. He argued that doing so was necessary to fully inform the jury of the law in light of the defense argument: "Without the jury being aware of the fact that there is another criminal liability theory here, and that is accessory to [*sic*: probably meant to be "after"] the fact, they're going to be influenced to believe that if she was given immunity, it was because she was an accomplice, and I just don't think that's fair under the facts of this case." Defendant objected. After considering the matter during a break, the court agreed to give the requested instruction.

Accordingly, the court instructed the jury on liability as an accessory: "Every person who, after a felony has been committed, harbors, conceals, or aids a principal in that felony with the specific intent that the principal may avoid or escape from arrest, trial, conviction, or punishment, having knowledge that the principal has committed that felony or has been charged with that felony, or convicted thereof, is guilty of the crime of accessory to a felony, in violation of Penal Code section 32." The court further instructed that an "accessory to a felony is not, by that fact alone, a principal in that felony."

In his rebuttal argument, the prosecutor cited this instruction to argue that Peretti might have been guilty of being an accessory, but that did not make her an accomplice.

47

Defendant contends the court erred in instructing the jury on accessory liability. It did not. Because someone who is merely an accessory under Penal Code section 32 is not "liable to prosecution for the identical offense charged against the defendant on trial in the cause" (Pen. Code, § 1111), that person is not an accomplice whose testimony requires corroboration. (See *People v. McKinzie* (2012) 54 Cal.4th 1302, 1353.) The trial court must instruct the jury "on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case." (*People v. Carter* (2003) 30 Cal.4th 1166, 1219.) To fully understand whether Peretti was an accomplice, it was necessary for the jury to know that an accessory is not necessarily an accomplice.

In a reprise of his earlier argument, defendant contends the evidence did not support the instruction because Peretti was an accomplice as a matter of law. As explained previously (pt. II.A.14, *ante*), she was not. The evidence that she originally lied about Huhn's involvement supported the accessory instruction. We see no error.

### 16. Asserted Prosecutorial Misconduct

Defendant contends that Glenn McAllister, the prosecutor, committed various acts of misconduct.

First, defendant contends the prosecutor committed misconduct in cross-examining defense witness James Stevens. At one point, the prosecutor asked, "Mr. Stevens, is it fair to say that you'll do whatever it takes to help Mr. Anderson avoid responsibility for his actions in this case?" The witness responded that he took an oath and planned to tell the truth. The prosecutor next asked, "Now, you took an oath so that you wouldn't perjure yourself?" The witness responded, "That's correct." Defense counsel objected that the question was argumentative.

48

The court ruled that the question and answer could stand but told the prosecutor not to ask any "more oath questions." The prosecutor then asked, "What you're telling us here is that you, who have been convicted of these felony offenses that you've told us about, just won't perjure yourself?" Defense counsel again objected that the question was argumentative. The witness said, "Sir, I do not plan on telling any lies. I am telling the truth, honest to God." The court said, "He indicates that he's telling the truth," and told the prosecutor to ask the next question. The prosecutor went on to other matters.

Defendant contends these questions were impermissibly argumentative. "An argumentative question is designed to engage a witness in argument rather than elicit facts within the witness's knowledge." (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1125.) It "is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony. Often it is apparent that the questioner does not even expect an answer. The question may, indeed, be unanswerable. . . . An argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper because it does not seek to elicit relevant, competent testimony, or often any testimony at all." (*People v. Chatman* (2006) 38 Cal.4th 344, 384.)

The questions were appropriate. The prosecutor may challenge defense witnesses' credibility. (*People v. Earp*, *supra*, 20 Cal.4th at p. 894.) He did so, and rather vigorously. The questions, "though barbed and accusatory at times" (*People v. Pearson* (2013) 56 Cal.4th 393, 436), were both answerable and actually answered, and they elicited testimony within the witness's personal knowledge—whether he was lying. The witness himself injected into the questioning that he had taken an oath. The prosecutor was entitled to ask a follow-up question on that point. The trial court acted within its discretion in permitting

these brief questions while limiting the length and scope of such questioning. (*People v. Chatman*, *supra*, 38 Cal.4th at p. 384.)

Second, defendant contends the prosecutor misstated the evidence regarding Brandon Handshoe's plea agreement during his final argument to the jury. In response to defense counsel's argument that the agreement made the witness incredible, the prosecutor noted that Handshoe would be sentenced to 17 years in prison. He argued, "Is it a lesser sentence? You bet it is. . . . Is it still a significant sentence? You bet it is. But, you know, the thing about Brandon Handshoe's 'deal' with the People is that it was done when it was done, and it was done before he testified on the stand. And he could have blamed this crime on Martians, and it wouldn't have changed his 17-year stipulated sentence."

Defense counsel objected that the argument "misstates the evidence." The court ruled, "This is argument. Ladies and gentlemen, you will have a copy of the agreement that was reached with Mr. Handshoe. I'm going to allow Mr. McAllister to argue his viewpoint on what that means."

The prosecutor went on to argue, "This would not have changed his sentence, if he came in and said Martians. Now, if you could make a case for perjury, . . . you can do a low-level felony, couple years maximum in state prison or something like that. The point is: The deal was struck, and no matter what he said, he was getting 17 years. If he came in and said it was Martians that did it, the deal that he was going to testify and get 17 years was a done deal. It can't go up, it can't go down; that's the way it is."

Later, outside the jury's presence, defense counsel renewed the objection. The court explained why it did not sustain the objection: "When the objection was made, it did appear to me that it might have been a characterization that was not borne out by the language of the agreement itself. And it could be, however, that any reasonable person reviewing that would conclude that what is the truth and

50

what is not the truth is going to be hard to establish; and, therefore, it would be difficult to revoke that agreement. My response was to leave that decision in the hands of jurors, simply because the agreement, the precise language of that, is going to be accessible. They can interpret it and determine if it was mischaracterized by Mr. McAllister."

To the extent the prosecutor argued that the agreement could never be rescinded under any circumstances, it mischaracterized the agreement—as any juror reading it would readily understand. Given the court's response in front of the jury, and its decision to make the agreement itself available to the jury, we see no reasonable likelihood the jury understood or applied the argument in an objectionable way. (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.) The jury knew exactly what the agreement said.

Third, defendant contends the prosecutor improperly vouched for his case in his final argument. The prosecutor argued, "But for the two defendants in this room [defendant and Lee] Stephen Brucker would be alive today. I believe with all my heart that I've provided you with the evidence to prove that that is true." Later, outside the jury's presence, defense counsel objected that the argument was improper vouching. The court disagreed: "I don't believe that was vouching for the credibility of any particular witness. I believe it was establishing that, in terms of the case that has been presented, the evidence that has been presented, the People have presented, and he was arguing he has presented a comprehensive case. I don't believe it could be interpreted that Mr. McAllister has inside information, that he is communicating on what the jurors should rely in determining the credibility of any particular witness."

Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office,

51

in support of the argument. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1329; *People v. Linton*, *supra*, 56 Cal.4th at p. 1207.) The prosecutor did not suggest his argument was based on evidence not available to the jury. On the contrary, he stated that it was based on the evidence he had "provided." To the extent the prosecutor's language, "I believe with all my heart," could be viewed as invoking his personal prestige or depth of experience, the brief remark could not have been prejudicial. We caution, however, that prosecutors should be wary of mentioning their personal beliefs about the quality of the evidence.

Finally, defendant contends the prosecutor committed misconduct by failing to redact a portion of the transcript of Handshoe's free talk before, he claims, the transcript was shown to the jury. Defendant did not object at trial on that basis, so the claim is forfeited. Additionally, the record does not support defendant's claim that the jury was shown the transcript.

Defendant cites only the trial court's statement, when it overruled defendant's objection to the prosecutor's argument regarding Handshoe's plea agreement, that the jury "will have a copy of the agreement." That statement indicates that the jury would receive a copy of the *agreement*. It does not suggest the jury would receive, or did receive, a copy of the transcript of the free talk that had occurred a month before the agreement. Nothing indicates the jury received the transcript. A copy of the agreement to engage in the free talk and of the ultimate plea agreement, consisting of three pages total, was marked into evidence as People's exhibit 66 and eventually received into evidence. That exhibit appears to be what the court was referring to. The record does not indicate a transcript of the free talk itself was even marked as an exhibit, much less received into evidence. Defendant's attorney cross-examined Handshoe about the *existence* of the free talk but not about its substance. She did not use the transcript itself.

Because the record does not support defendant's claim that the jury was given the transcript of the free talk, we need not consider whether presenting it to the jury would have been error or misconduct.

### 17. Court's Response to the Other Jury's Verdict

Apollo Huhn was tried in front of a different jury than defendant and Randy Lee. The Huhn jury returned a verdict before defendant's jury did. Defendant contends the court erred in handling that situation.

#### a. Factual Background

Huhn's jury began deliberating two days before defendant's jury. While the Huhn jury was deliberating, counsel for defendant requested that if Huhn's jury reached a verdict before defendant's jury did, the verdict be sealed until defendant's jury also reached a verdict. The prosecutor expressed the concern that, unless Huhn waived the right to have the jury polled in open court, sealing the verdict would not ensure that the verdict would be valid later if something were to happen to one of the jurors. Counsel for Huhn stated he would not waive the right to have the jury polled.

The court responded that it would "think about this, and maybe delve into it . . . and possibly come up with a proposal that satisfies a legitimate concern expressed by the People. If there is a verdict and we're going to seal it, how do we ensure that that becomes an official verdict at some point in time, should there be a loss of a juror?" The prosecutor suggested "that we take the verdict in a closed courtroom, and you put a protective order on the result, and that the verdicts are sealed in court." The court responded, "There seems to be concurrence by the People that the effort to ensure that there is not dissemination of a verdict by one panel before the verdict of the other panel is a good objective, a reasonable goal.

53

We will try to achieve that without jeopardizing the rights of either party." The court then recessed for the day.

The day after defendant's jury began deliberating, the Huhn jury announced it had reached a verdict. In Huhn's matter, in the absence of defendant and his attorneys, Huhn's attorney, the prosecutor, and the court discussed how to proceed. The court noted that, even though defendant and his attorneys were not present, they had requested "that the court take precautions to ensure that the continuing deliberations of one jury are not affected or influenced in any way by a public verdict." It recognized that "it is so sensitive at this point in time that we have a jury deliberating on identical facts, that there has to be some step to ensure that the other jury is not influenced. I don't want to jeopardize any rights that Mr. Huhn has or the People in terms of this jury, but I think that we can take some steps that satisfy the needs of the People, Mr. Huhn, as well as the needs of the defendants who currently have a jury out deliberating their fate."

The court suggested sealing the verdict form and having the jury return later to complete taking the verdict. However, Huhn's attorney refused to waive the right to have the jury polled, to have a public hearing, and to have the verdict taken that day. Citing Penal Code section 1147, the court stated that, although its preference would be to "take some steps to ensure that the verdict is not public," without a waiver from Huhn, it was "obligated to take the verdict. And, therefore, we will take the verdict." Thereafter, in open court, the jury Huhn returned a verdict of guilty.

Later that day, while defendant's jury was still deliberating, the parties in defendant's matter discussed the situation. The court stated the intent "to simply repeat the standard admonishments." It also asked were there "any suggestions regarding the admonishments? I am not going to focus on there is going to be a news report, I'm just going to emphasize the standard order is in place, unless

54

either side would like me to focus on the likelihood that there is going to be news reports so please, please, be cautious, have somebody screen the paper for you. I don't want to do that, unless you both agree, because it seems to arouse curiosity unnecessarily, and then I will." Defendant's attorney responded, "I agree with the court on that, and besides, the cat is kind of out of the bag at this point."

When defendant's jury recessed for the day, the court admonished it: "I simply want to remind you of certain rules while you're off for a long weekend. I appreciate the fact that you're probably tired of hearing me admonish you regarding what can and cannot be said outside the jury deliberation room, but this is so important that I thought I will bring you in again and remind you. The separation is going to be fairly lengthy. You will be off tomorrow and returning at nine o'clock Monday. During this period of time, do not discuss anything concerning the case with anyone. I'm going to repeat that. Do not discuss anything regarding the case with anyone. That means family members, spouses, brothers, sisters, neighbors, you cannot talk about this case at all. . . . Do not read, view, listen to any account or discussion of the case reported in the news media. Please be cautious. This is a long period of time where you're going to be away from the courthouse. Don't let any family member coax you into looking at something that they feel might be associated with the case. Be cautious, don't scan the headlines, just ignore them, if you would, the local section, regarding any type of criminal case."

The court asked the jury if there was any uncertainty about these orders. "If there is," it instructed, "please let me know, because it is so important that you abide by these." There was no response. The court then recessed for the weekend.

The jury resumed deliberation the following Monday. Outside the jury's presence, defendant's attorney objected to the process of taking the Huhn verdict. He presented the court with an online article and a newspaper article about the

55

verdict that he claimed were prejudicial. The jury returned its verdict later that day.

### b. Analysis

Defendant contends the court should have delayed taking the Huhn verdict until his own jury reached a verdict, or sealed the verdict rather than take it in open court, or imposed a "gag order," or at least inquired into whether the Huhn verdict had influenced his jury. We disagree. The court handled the situation appropriately.

The trial court was properly concerned that Huhn had the right to have the verdict taken that day, to have the proceeding be public (a right the public probably also had), and to poll the jurors about their verdict. (Pen. Code, §§ 1147, 1163; *Press-Enterprise Co. v. Superior Court of Cal.* (1984) 464 U.S. 501; *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178 (*NBC Subsidiary*); *People v. Edwards* (1991) 54 Cal.3d 787, 812-813.) Huhn refused to waive any of his rights. We need not consider in detail the exact nature of these rights or the potential consequences of violating any of them, because the court acted with proper caution in trying to protect Huhn's rights by taking the verdict that day in open court. Additionally, under the circumstances, trying to impose a gag order on the parties, court personnel, media, and public would probably have been inappropriate and certainly unrealistic. We cannot fault the court for taking the verdict in open court and permitting the press to report it.

Instead, the court firmly readmonished the jury not to read or view any media coverage of the trial. "We must presume that jurors generally follow instructions to avoid media coverage, and to disregard coverage that they happen to hear or see. . . . '[A]bsent a contrary indication in the record, it must be assumed the jury followed its instruction to avoid all publicity in the case.' . . .

56

To paraphrase Justice Holmes, it must be assumed that a jury does its duty, abides by cautionary instructions, and finds facts only because those facts are proved. (*Aikens v. Wisconsin* (1904) 195 U.S. 194, 206.)" (*NBC Subsidiary*, *supra*, 20 Cal.4th at pp. 1223-1224; see *Skilling v. United States* (2010) 561 U.S. 358, 388, fn. 21.) Defendant suggests the admonition was insufficient. But he did not request an alternative, even though the court invited suggestions. The admonition seems sufficient to us.

Defendant also argues the court should have inquired into whether the Huhn verdict had influenced his jury. He did not request an inquiry at the time. (*People v. Martinez* (2010) 47 Cal.4th 911, 943.) But even if we assume the failure to request an inquiry does not forfeit the claim, as we assumed in *Martinez*, no inquiry was needed. " 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct . . . rests within the sound discretion of the trial court. . . . [A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " (*People v. Manibusan*, *supra*, 58 Cal.4th at p. 53; accord, *Martinez*, at p. 942.) Here, no information suggested juror misconduct was occurring or was likely to occur. Although the court had the authority to conduct an inquiry had it believed one was warranted (see *NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1224, fn. 50), it did not abuse its discretion in failing to hold one.

Defendant cites *People v. Cummings* (1993) 4 Cal.4th 1233, another case involving two juries. That case does not aid him. There, the trial court knew that two jurors had learned of the codefendant's jury verdict. The court then appropriately conducted an inquiry to ensure that the jury remained impartial. (*Id.* at pp. 1331-1332.) Here, the court had no information suggesting an inquiry was needed.

Ultimately, the problem here was little different than the difficulties inherent in conducting any publicized trial. The media will always cover such trials, including during the trial itself. And, in this country, appropriately so. As the United States Supreme Court has noted, "News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates." (*Skilling v. United States*, *supra*, 561 U.S. at p. 399, fn. 34.) We must trust the jury to follow its sworn duty to decide the case solely on the law and evidence presented to it. The court's admonitions to the jury were sufficient. Absent information warranting further inquiry, none was required.

### 18. Asserted Jury Misconduct

Defendant contends the "jury engaged in misconduct when jurors were given an exhibit not admitted into evidence during deliberations." The jury did not commit misconduct, although judicial error occurred.

### a. Factual Background

John Pasquale, who had shared a jail cell in Oregon with defendant, testified about defendant's escape plans. On cross-examination, defense counsel confronted him with a letter he had written to the prosecutor in this case stating, "There is no doubt in my mind of Brandon Handshoe's [*sic*] guilt in your case against him because of information he disclosed to me in Burns County Jail in Oregon where we shared a cell." He also said, "I would like to help you to convict him of murder an[d] see to the fact that he never kills again." In the letter, Pasquale asked the prosecutor for help in avoiding a prison sentence in Colorado. He testified that he meant defendant rather than Handshoe. He used the name "Brandon Handshoe" in the letter because, he believed, that was what defendant had originally told him defendant's name was. He never actually met the real Brandon Handshoe. The letter was placed into evidence.

58

On redirect examination, the prosecutor showed the witness a letter from the prosecutor to the witness responding to the witness's letter. The prosecutor stated in the letter that there was nothing he "can do regarding any cases you may have pending." The letter also stated, "I also appreciate how difficult it is to find yourself in the position of being compelled to testify in such a serious case while incarcerated as an inmate. But, as you pointed out, the greater good here is to see that Anderson is not in a position to harm others in the future." The witness testified that he had not received the letter, and it was never admitted into evidence. The clerk's transcript indicates the letter had been withdrawn but then was "erroneously submitted to" defendant's jury.

After trial, defendant moved for a new trial due to the jury's mistakenly receiving the letter. At the hearing on the motion, the court acknowledged that it appeared the letter had been erroneously "placed in the jury room." It also assumed, "in ruling on this motion that the jurors looked at this letter, even though there is no evidence that they, in fact, did." However, it found no prejudice and denied the new trial motion.

### b. Analysis

Defendant claims the jury committed misconduct. However, even assuming, as the trial court did, that the jury viewed the letter, it did nothing wrong. "When, as in this case, a jury innocently considers evidence it was inadvertently given, there is no misconduct. . . . There has been merely 'an error of law . . . such as . . . an incorrect evidentiary ruling.' [Citation.] Such error is reversible only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error." (*People v. Cooper* (1991) 53 Cal.3d 771, 836.)

No such reasonable probability exists in this case. The error was insignificant. The letter contained no factual content, merely the prosecutor's rather mildly stated opinion. The jury already knew, through defendant's cross-examination and the letter the witness wrote, that Pasquale professed to believe defendant guilty and in need of being convicted so he would not kill again. (Pasquale used the name "Handshoe" in the letter, but, as he testified, he obviously meant defendant. Pasquale shared a cell only with defendant and never with Handshoe.) Given the evidence the prosecutor had presented, it could hardly be a revelation for the jury to learn that, in responding to Pasquale's letter, the prosecutor agreed that defendant must not be in a position to harm others.

Contrary to defendant's additional argument, the error was also not prejudicial at the penalty phase. The same prosecutor's penalty argument to the jury was much stronger than the single sentence defendant complains of now. Accordingly, the court did not abuse its discretion in denying the new trial motion. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 127.) Indeed, we are confident under any standard that the verdicts rested on the evidence, instructions, and argument properly presented, and not at all on the letter the jury was inadvertently permitted to see.

### B. Issues Concerning Penalty

#### 1. *Defendant's Statement to the Jury*

Defendant contends that the court's permission to make his statement to the jury quoted in part I.B.2, *ante*, denied him a reliable penalty determination in violation of various state and federal constitutional rights. (See *People v. Mai* (2013) 57 Cal.4th 986, 1054.) He argues the court should have prohibited the statement or at least stricken the harmful part. We disagree. Acquiescing in defendant's wishes did not violate his rights.

60

A defendant has an "absolute right to testify," and that right "cannot be foreclosed or censored based on content." (*People v. Webb* (1993) 6 Cal.4th 494, 535, citing *People v. Guzman* (1988) 45 Cal.3d 915, 962.) Defendant's statement was not entirely harmful to him. He was able to assert his innocence without subjecting himself to cross-examination. We do not suggest defendant had a *right* to make such a statement rather than testify in the usual fashion, merely that once the court permitted him to do so, it could not censor what he said. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 766.) Presumably, defendant would not want the court to prohibit or strike that portion of his statement, only the harmful part. But the court had no obligation to strike any portion of the statement.

"[W]e have repeatedly rejected the contention that the constitutional reliability of a death judgment is undermined by recognizing the defendant's personal right to testify in favor of the death penalty." (*People v. Mai*, *supra*, 57 Cal.4th at p. 1056, citing *People v. Nakahara* (2003) 30 Cal.4th 705, 719, *People v. Webb*, *supra*, 6 Cal.4th at pp. 534-535.)

Defendant also argues that the trial court should at least have instructed "the jury sua sponte not to consider [his statement] in choosing the appropriate penalty." In *People v. Guzman*, *supra*, 45 Cal.3d at page 962, we suggested that the court might give a special instruction "inform[ing] the jury that despite the defendant's testimony, it remains obligated to decide for itself, based on the statutory factors, whether death is appropriate." We also held the court had no sua sponte duty to give the instruction. (*Ibid.*) The trial court gave such an instruction in *Webb*. (*People v. Webb*, *supra*, 6 Cal.4th at p. 535 & fn. 29.)

The court here did give essentially that instruction. When the parties discussed the penalty instructions, the court stated that, "in anticipation of Mr. Anderson's testimony," it had added to the standard instructions language that "each of you remain obligated in weighing the factors in aggravation and

61

mitigation whether death is the appropriate penalty despite testimony offered by the defendant suggesting . . . ." At this point, the court invited suggestions, and the parties discussed the exact language to be used. The court agreed to language that defense counsel either suggested or said he wanted. Defense counsel requested no other instruction in this regard. Ultimately, the court modified the standard instruction to add the following: "Each of you remains obligated to decide for yourself, based upon the weighing of the factors in aggravation and mitigation, whether death or life without possibility of parole is the appropriate penalty, despite testimony offered by the defendant suggesting a preference for a particular penalty."

This instruction was sufficient to protect defendant from an unreliable verdict. (*People v. Webb*, *supra*, 6 Cal.4th at p. 535.) Indeed, we have upheld death verdicts even absent such a specific instruction. (*People v. Mai*, *supra*, 57 Cal.4th at p. 1056 [finding the other instructions sufficient]; *People v. Nakahara*, *supra*, 30 Cal.4th at p. 719 ["The jurors in this case were properly instructed that their duty was to decide the appropriate penalty, based on the law and the evidence, and defense counsel's closing arguments confirmed that principle and expressed skepticism about defendant's asserted preference for death"].) The prosecutor never relied on defendant's statement in seeking the death penalty. His only comment on that statement, an indirect one, came near the end of his jury argument where he said, "This is not about what the defendant wants. It is about what he deserves." Defense counsel also argued that defendant's "request for a death sentence is something that is not an appropriate consideration for you. You're going to be specifically instructed that that is not something for you to base your verdict on, penalty on." (The jury instruction in this regard came after argument.)

62

Defendant argues that a different instruction was necessary. But he requested nothing different. Indeed, he participated in the discussion leading to everyone agreeing on the exact language the court should use. In substance, that language was what we suggested in *Guzman* and what was given in *Webb*. Because there was no sua sponte duty to give *any* instruction, there certainly was no sua sponte duty to give a different instruction. We see no error.

### 2. *Claims of Instructional Error*

The court gave the standard instructions set forth in CALJIC Nos. 8.85 and 8.88 as they existed at the time of trial (see CALJIC, Oct. 2005 ed.) except that it modified CALJIC No. 8.88 in two respects. First, at the request of both the prosecutor and defendant, it added the sentence, "In reaching your determination on the appropriate penalty, you must consider death to be a greater punishment than life without possibility of parole." Second, it added the sentence discussed in part II.B.1., *ante*, referring to defendant's statement. Defendant contends the court erred in denying his request to modify the instructions in three other respects. We disagree. "In general, we have consistently held that the standard jury instructions, CALJIC Nos. 8.85, 8.86, 8.87, and 8.88, adequately and properly instruct on the jury's determination of sentence." (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 456.) "No additional instructions were required." (*People v. Valencia* (2008) 43 Cal.4th 268, 309.)

First, defendant contends the court should have revised CALJIC No. 8.85 to state "that the list of aggravating and mitigating factors was an exclusive list." But the standard instructions the court gave effectively do so. The court instructed: "You shall consider, take into account and be guided by the following factors, if applicable." Then follows the statutory factors. (CALJIC No. 8.85.) The court also instructed: "[Y]ou shall consider, take into account and be guided by the

63

applicable factors of aggravating and mitigating circumstances upon which you have been instructed." (CALJIC No. 8.88.) No additional limiting instruction was required. (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 457; *People v. Sattiewhite* (2014) 59 Cal.4th 446, 490; *People v. Lucero* (2000) 23 Cal.4th 692, 728.)

As defendant notes, in *People v. Hillhouse* (2002) 27 Cal.4th 469, 509, footnote 6, we said, "To avoid any possible ambiguity in the future, we suggest that, on request, the court merely tell the jury it may not consider in aggravation anything other than the aggravating statutory factors." But the "possible ambiguity" mentioned existed only in the specific instructions given in that case; it does not exist in the standard instructions given here. In *Hillhouse*, the court "instructed the jury, 'The factors A through J [of Penal Code section 190.3] which I have just listed are the only factors that can be considered by you as *aggravating factors* . . . .' " (*Id*. at p. 508, italics added.) The defendant argued that this instruction allowed the jury to consider in aggravation all the listed factors, including those that can only mitigate. We rejected the argument but added the suggestion in footnote 6. (*Id*. at pp. 508-509.) Nothing in the standard instructions given here suggests that mitigating factors can be considered in aggravation, so the suggestion in footnote 6 of *Hillhouse* is not needed. The cases cited above rejecting this contention apply here, not *Hillhouse*.

Second, defendant argues the court should have revised the standard instruction to state "that there need not be any mitigating circumstances to justify a decision that the penalty be life without parole." We have repeatedly rejected the contention and continue to do so. The additional language was unnecessary in light of the instruction actually given. (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 457; *People v. Ray* (1996) 13 Cal.4th 313, 355-356.)

64

Third, defendant argues the court should have instructed on lingering doubt. It did not have to do so. "[A] penalty phase jury may consider lingering doubt as a factor in mitigation. But . . . a trial court is under no obligation, constitutional or otherwise, to give a lingering doubt instruction." (*People v. Brooks*, *supra*, 3 Cal.5th at p. 104.) As the trial court noted in refusing defendant's request, the defense may *argue* lingering doubt. Defense counsel did so, at length. But no specific instruction was needed.

### 3. Challenges to California's Death Penalty Law

Defendant repeats many challenges to California's death penalty law that we have repeatedly rejected and continue to reject.

"Penal Code sections 190.2 and 190.3 are not impermissibly broad, and factor (a) of Penal Code section 190.3 does not make imposition of the death penalty arbitrary and capricious." (*People v. Sánchez, supra*, 63 Cal.4th at p. 487.) " 'Except for evidence of other crimes and prior convictions, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; the jury need not achieve unanimity except for the verdict itself; and written findings are not required.' " (*Ibid*.) "Intercase proportionality review is not required." (*Id*. at p. 488.) "Admission of evidence of prior unadjudicated criminal activity does not violate a defendant's constitutional rights." (*People v. Hartsch* (2010) 49 Cal.4th 472, 515.) "The trial court is not obligated to advise the jury which statutory factors are relevant solely as mitigating circumstances and which are relevant solely as aggravating circumstances." (*People v. McKinnon* (2011) 52 Cal.4th 610, 692; see *People v. Page* (2008) 44 Cal.4th 1, 61.) "California's death penalty law does not violate equal protection by treating capital and noncapital defendants differently." (*Sánchez*, at p. 488.) "California's use of the death penalty does not violate international law." (*Ibid*.)

Defendant argues we should not consider these arguments in isolation but should view California's death penalty law as a whole. Citing *Kansas v. Marsh* (2006) 548 U.S. 163 (holding, in light of the statutory scheme as a whole, that the statute's requirement that death be imposed if aggravating and mitigating factors are in equipoise did not create a presumption in favor of death) and *Pulley v. Harris* (1984) 465 U.S. 37, 51 (rejecting the contention that comparative proportionality review is required in death penalty cases but, "[a]ssuming that there could be a capital sentencing system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review," reviewing the entire statutory scheme), defendant argues that the "constitutionality of a State's death penalty system turns on review of that system in context." Even considering the arguments in combination, and viewing the death penalty law as a whole, it is not constitutionally defective. Defendant's challenges to California's death penalty scheme "are no more persuasive when considered together," than when considered separately. (*People v. Simon* (2016) 1 Cal.5th 98, 150.) "California's capital sentencing scheme as a whole provides adequate safeguards against the imposition of arbitrary or unreliable death judgments." (*People v. Williams* (2008) 43 Cal.4th 584, 648; accord, *People v. Johnson* (2016) 62 Cal.4th 600, 658.)

### 4. *Cumulative Effect of the Errors*

Defendant contends the cumulative effect of the asserted errors was prejudicial as to both guilt and penalty. We disagree. The errors, actual or assumed, were insignificant. Even in combination, they were not prejudicial.

### 5. *Determinate Sentence on Noncapital Crimes*

In addition to sentencing defendant to death, the court imposed a prison sentence for the other counts and prior convictions. The sentence included a

consecutive one-year enhancement for the prior prison term. (Pen. Code, § 667.5, subd. (b).) Defendant argues, and the Attorney General concedes, that, because the prison term was served for two of the convictions for which the court also enhanced the sentence, the enhancement for the prior prison term must be stricken. We agree. (*People v. Jones* (1993) 5 Cal.4th 1142.)

### III. CONCLUSION

We modify the judgment by striking the one-year enhancement for the prior prison term and direct the trial court to send to the Department of Corrections and Rehabilitation a corrected abstract of judgment with the enhancement stricken. We affirm the judgment as modified, including the judgment of death.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C.J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GILBERT, J.\***

_____

\*       Presiding Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Anderson
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S138474
**Date Filed:** June 28, 2018
_____

**Court:** Superior
**County:** San Diego
**Judge:** Lantz Lewis

_____

**Counsel:**

Joanna McKim, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens, Theodore M. Cropley and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Joanna McKim
P.O. Box 19493
San Diego, CA  92159
(619) 303-6897

Michael T. Murphy
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9211