Filed 5/14/24  P. v. Ortega CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALFREDO ORTEGA,<br><br>    Defendant and Appellant. | D081407<br><br><br>(Super. Ct. No. SCE404782) |


APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Evan Stele, Deputy Attorneys General, for Plaintiff and Respondent.


A jury convicted Alfredo Ortega of several crimes related to the abuse of his girlfriend:  assault with a deadly weapon (a car) (Pen. Code, § 245,

subd. (a)(1)[1]), hit and run with injury (Veh. Code, § 20001, subd. (a)), corporal injury to a significant other (§ 273.5, subd. (a)), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), and stalking (§ 646.9, subd. (a)). Before its deliberation, however, the jury was inadvertently provided a copy of the PowerPoint presentation used by the District Attorney during her closing argument.

On appeal, Ortega asserts this mistake violated his due process and fair trial rights, requiring reversal of the jury's verdict. In response, the Attorney General concedes the trial court's mistake was error, but argues the error was not prejudicial. Because the presentation contained only information that was already before the jury, we agree with the Attorney General that the error was harmless and affirm the convictions.

Ortega also filed a petition for writ of habeas corpus (*In re Ortega* (D082136)), which we ordered considered with this appeal. We deny the petition by separate order.

FACTUAL AND PROCEDURAL BACKGROUND

A. *September 14, 2020 Incident*

Ortega and the victim, C.K., began a romantic relationship in February 2020, but had been friends for many years before. On September 14, 2020, C.K. was at Ortega's house. She needed to pick up prescriptions from CVS, and told Ortega she wanted to go alone. This angered Ortega. C.K. left in her pickup truck, and as she was leaving she saw Ortega get into a white Audi station wagon.

C.K. headed east on Interstate 8. While driving in the fast lane on the freeway, C.K. saw the white Audi behind her approaching at a high rate of speed. The Audi moved to the middle lane of the three-lane freeway and

---

1    Subsequent undesignated statutory references are to the Penal Code.

pulled up next to her. C.K. decided she should exit the freeway, and merged into the middle lane. Ortega then merged into the exit lane next to her, preventing her from merging into that lane. C.K. told the lead investigating California Highway Patrol (CHP) officer, Erick Parra, that she made several attempts to speed up and slow down to get into the exit lane, but Ortega matched her speed changes and prevented her from changing lanes.

C.K. feared that Ortega was going to ram her truck with his car. C.K. also reported to Parra that during the pursuit, Ortega repeatedly called her phone. After C.K. missed two exit attempts, she was finally able to merge into the exit lane. C.K. then heard a car accelerating behind her and felt the car make impact with her truck. The impact caused C.K. to lose control of the truck, which rolled over before landing in the embankment next to the freeway exit.

After her truck came to a stop, C.K. thought she heard Ortega's voice. Terrified, she got out of the truck and ran up the embankment towards nearby homes. She saw an open garage and approached a man, M.L., who was working out inside. M.L. saw that C.K. was injured and bleeding from a large cut on her foot. She also had a golf ball sized lump on her head that was bleeding. C.K. was scared and panicked, and she told M.L. that her boyfriend was trying to kill her.

C.K. also asked M.L. to give her a ride. He told her he could not leave, that he had three children inside the house, but that he would call 911. C.K. begged him not to call the police. Over C.K.'s objection, M.L. called 911. As M.L. described what was happening to the 911 operator, C.K. left the garage. Shortly after, first responders located C.K. Parra spoke with C.K. and she told him that Ortega had intentionally rammed her truck, and described the

terrifying interaction on the freeway. C.K. also gave Parra a description of Ortega. C.K. was taken to the hospital and treated for her injuries.

When the responding officers arrived at the scene of the collision, they found C.K.'s pickup truck with significant rollover damage down the embankment next to the freeway exit. Other drivers were standing around the scene. Two witnesses told Parra that they saw the collision. Their statements to the CHP officers were consistent with C.K.'s account and one of the witnesses saw the white car drive away after the collision.

In addition, the first CHP officer who responded to the scene, Justin Cardec, saw a man matching C.K's description of Ortega standing close to the flipped truck. When Cardec called to the man, he fled. Cardec testified the man looked sweaty and since the man was not responding to his commands, he thought the man might have been under the influence of drugs or alcohol. Later that evening, Parra showed Cardec a picture of Ortega and Cardec identified the individual he saw as Ortega.

Three days after the hit and run, C.K. met with Parra to give another statement. In this second interview, she gave the same account of the incident and provided additional details. The following day, an investigator from the District Attorney's office went to Ortega's residence and saw a white Audi station wagon parked on the street that matched C.K.'s description of the car that hit her truck. The Audi had damage on its front left bumper that was consistent with C.K.'s description of the accident.

B. *March 2021 Incident*

In 2021, C.K. was living with Ortega at his house in National City. In March 2021, a neighbor, J.H., was washing his car when he saw a man drive down the street, park, and meet a woman standing outside of the house next door. J.H. saw the man grab the woman by the forearm and force her into

4

the house. Minutes later, J.H. heard yelling and what sounded like someone being thrown against a wall. J.H. heard the voice of a woman yelling in a way that made him think she was being hurt. J.H. called 911.

A National City police officer, Pamela Sosa, responded to the call and met J.H. outside. J.H. told the officer where the yelling and banging sounds were coming from. As Sosa approached Ortega's house, she saw Ortega leaving and asked him if he had been involved in a dispute with a woman. Sosa noticed that Ortega had a scratch behind his ear that was bleeding.

Sosa then approached C.K., who had also come outside. Sosa testified that C.K. was crying and visibly upset. C.K. told Sosa that she found a dating app on Ortega's phone, called him and the couple had an argument over the phone. During the argument, Ortega told C.K. they would discuss it once he was home. C.K. told Sosa that when Ortega arrived at the house, she went outside to greet him and he grabbed her by the arm and forced her inside. The argument continued and C.K. started to pack a bag to leave. C.K. told Sosa that Ortega started throwing her things around the house and he threw C.K. to the ground, straddled her, and began strangling her.

Sosa went inside and saw items strewn all over the house, including C.K.'s bag. Sosa noted and photographed injuries to C.K.'s neck, head, elbow, knee, and back. Sosa testified that she thought the injuries on C.K.'s neck were consistent with C.K.'s report of strangulation.

C. *June 2021 Incident*

In May or June 2021, C.K. decided to leave Ortega. She went to stay with a friend, C.H.[2] C.H. had known both Ortega and C.K. for over 20 years.

---

[2] C.H. testified that after the car crash, C.K. was hospitalized for several days and then stayed with C.H. for two days after she was released from the hospital. C.H. also told the jury that C.K. told her Ortega had chased her on the freeway and caused the rollover.

5

C.K. stayed with C.H. on and off for several months. During this time, C.K. was constantly changing her phone number and her phone because she feared Ortega was using her phone to track her. While C.K. was staying with C.H., Ortega would regularly show up uninvited. C.K. told C.H. she did not want Ortega coming over.

In June 2021, C.K. went to another friend's apartment in Lemon Grove after an incident with Ortega earlier in the day. While at the apartment, C.K. thought she saw Ortega and believed he was following her. C.K. was afraid and thought Ortega was tracking her, so she locked herself in the laundry room and called 911. A police officer responded, but did not find Ortega.

Later that night, C.K. was at C.H.'s house with another friend, R.P. C.K. told R.P. that her ex-boyfriend, Ortega, was stalking her. C.K. also told R.P. that she needed to pick up one of her other cars that was parked at someone else's house. R.P. agreed to help her, and around midnight, C.K. and R.P. left C.H.'s house to go pick up the car. When they got close to the location, C.K., who was driving, saw Ortega in a white Mercedes and sped off. Ortega followed C.K. and R.P. R.P. testified that C.K. appeared scared, and ran multiple red lights to evade Ortega. According to R.P., Ortega chased them at high speeds and Ortega and C.K. were both driving erratically. Eventually, Ortega pulled in front of C.K. and started backing up towards them. C.K. was able to speed off, but Ortega continued to pursue her.

During the chase, R.P. called 911. C.K. and R.P. eventually lost Ortega and headed back towards C.H.'s house. C.K. drove onto a one-way street in front of C.H.'s house. R.P. then saw Ortega's car driving the wrong way down the one-way street towards them. C.K. began reversing quickly, lost control, and hit a curb, puncturing one of her car's tires. C.K. and R.P. got out of the

6

car and headed towards C.H.'s house. Ortega also got out of his car; R.P. testified that Ortega said he just wanted to talk. C.K. told Ortega she had called the police and Ortega got back into his car and drove away. Eventually, a police officer arrived and took statements from C.K. and R.P. about the incident.

D. *Additional Evidence & Defense Case*

C.K. took the stand over two days. Her trial testimony was entirely inconsistent with her prior statements to police. At the start of her direct examination by the prosecutor, C.K. stated she had brain surgery just three weeks before trial, which was impeding her memory. She could not recall how long she had been with Ortega or the contours of their relationship, but she knew she wanted to help him. C.K. testified that she suffered from post-traumatic stress disorder (PTSD) and other mental health disorders that caused her to blame Ortega for acts she believed were actually perpetrated by her ex-fiancé, J.M. C.K. ended her relationship with J.M. just before her relationship with Ortega began.[3] C.K. also testified that another ex-boyfriend prior to J.M. had engaged in high-speed car chases with her, which gave her PTSD that she believed caused her to hallucinate Ortega chasing her.

C.K. testified that she had no memory of Ortega ever harming her, except during consensual sex. She explained that she liked to be choked during sex, which caused the injuries to her neck observed by Sosa in March 2021. C.K. also testified that the neck injuries were the result of a botched plastic surgery procedure, and that her eyes appeared red in the pictures taken by Sosa because of a hereditary condition. C.K.'s mental health

---

[3]     J.M. testified that he had hired a private investigator to follow C.K. after he discovered Ortega in an apartment he rented for C.K. and to recover a car C.K. had taken from him.

7

struggles, and inconsistent testimony, formed the basis for Ortega's defense. In addition to C.K.'s testimony, Ortega presented the testimony of a psychiatrist who evaluated C.K. and diagnosed her with schizoaffective disorder bipolar type, the symptoms of which included psychosis and hallucinations.

The defense also relied on the testimony of two witnesses at the scene of the rollover crash. One of those witnesses testified that he was behind C.K.'s and Ortega's vehicles and they appeared to be jockeying for position. He thought it was an incident of road rage. He also testified that he thought the rollover was caused by the truck changing lanes erratically, which caused its driver to lose control. He did not know if the white SUV had struck the truck, but he thought if it had, it was not intentional. The other witness, who was driving next to the truck and SUV before the crash, testified he thought the white SUV had caused the accident, not by hitting the truck, but by cutting it off aggressively.

The defense also presented the testimony of a friend of Ortega's, T.S., who was with Ortega the night of the car chase in June 2021. T.S. testified that Ortega and C.K. had visited him at his home earlier in the day and had arrived in separate cars. T.S. said Ortega and C.K. had left together in the same car and left the other car parked in front of his home. Ortega then returned later in the evening by himself. T.S. had security cameras that recorded the front of his house and later that night the camera system alerted him that someone was there. T.S. and Ortega saw someone near the white car that C.K. and Ortega had left earlier in the day. T.S. said that Ortega went outside, the white car left, and then Ortega left in his car.

E. *Verdict & Sentencing*

After the conclusion of the trial, the jury returned guilty verdicts on all five charges against Ortega:  assault with a deadly weapon resulting in great bodily injury (count 1; § 245, subd. (a)(1), § 12022.7, subd. (e), Veh. Code, § 13351.5); hit and run with injury (count 2; Veh. Code, § 20001, subd. (a)); inflicting corporal injury on a significant other (count 3; § 273.5, subd. (a)); assault with force likely to produce great bodily injury (count 4; § 245, subd. (a)(4)); and stalking (count 5; § 646.9, subd. (a)).

Ortega admitted he was out on bail when he committed counts 3, 4, and 5 (§ 12022.1, subd. (b)).  Ortega also admitted aggravating factors under California Rules of Court, rule 4.421(a)(1), (a)(3), (b)(1)–(3).

Thereafter, the trial court sentenced Ortega to a total term of seven years and eight months in prison.  On count 1, the trial court imposed the midterm of three years and an additional four years for the section 12022.7 allegation.  On count 2, the court imposed one-third of the midterm for eight months to run consecutively to count 1.  On count 3, the court imposed the midterm of three years to run concurrently to count 1 and struck the section 12022.1 allegation for the purpose of sentencing.  On count 4, the court imposed the midterm of three years, but stayed it under section 654.  On count 5, the court imposed the midterm of two years to run concurrently to counts 1 and 2 and struck the section 12022.1 allegation for sentencing.  The court also imposed $3,000 in restitution and various fines and fees.  Ortega timely appealed from the judgment of conviction.

## DISCUSSION

Ortega's sole contention on appeal is that the jury's verdict must be reversed because his fair trial and due process rights were violated by the trial court inadvertently providing the jury with a copy of the district

9

attorney's closing argument presentation. The Attorney General concedes this mistake was error, but asserts that there was no prejudice because all of the information in the presentation was already before the jury.

A

*Additional Background*

Before closing arguments, the court instructed counsel to exchange copies of whatever materials they intended to use. The court also explained that printouts of any presentation would be marked as court's exhibits to preserve them for the appellate record. After the conclusion of the trial, the clerk inadvertently provided the jury a copy of the prosecutor's PowerPoint presentation that she had submitted for this purpose. The presentation consisted of 40 slides containing jury instructions, definitions, photos that had been entered into evidence, several witnesses' names, and the relevant dates connected to each count.

Slides 1 and 2 listed the charges in counts 1 through 5. Slides 3 through 12 related to the September 14, 2020 rollover incident. Slide 3 contained the date, "September 14, 2020," followed by "Count 1, PC245(a)(1)" and "Count 2, VC20001(a)." Slide 4 contained three photographs of the damage to the truck and Audi involved in the incident. Slide 5 contained a portion of the jury instructions given for count 1, assault with a deadly weapon. Slides 6 and 7 contained language from the jury instructions that defined deadly weapon and application of force. Slide 8 contained the great bodily injury allegation and the definition of great bodily injury provided to the jury. Slides 9 and 10 contained photos depicting C.K.'s injuries from the day of rollover incident. Slide 11 contained language from the jury instructions for count 2. Slide 12, also based on the jury instructions, stated, "Does not matter who 'caused' the collision."

10

Slides 13 through 26 related to the March 2021 incident. Slides 13 and 14 had the dates February 1, 2021 and February 16, 2021 and the word "corroboration" under the dates. Slide 15 had the date of the strangulation, March 9, 2021, and listed the two associated counts, counts 3 and 4. Slides 16, 17, 18, 19, 20, and 21 contained photos of C.K.'s injuries from the strangulation, the house she shared with Ortega in National City, and screenshots of the body worn camera of Sosa. Slide 18 also had the words "fresh injuries" next to a photo of a red mark on C.K.'s forehead. Slides 22 and 23 contained language from the jury instructions for count 3 and a definition for traumatic condition. Slide 24 contained language from the jury instruction for count 4. Slide 25 contained additional photos of C.K.'s neck showing injury from the strangulation. Slide 26 contained the names of two witnesses, the medical professionals who treated C.K. and testified about the strangulation.

Slide 27 listed the date range of "June 1, 2021" to "June 30, 2021" with count 5 written underneath. Slides 28 and 29 contained two exhibits entered into evidence, a screenshot of a text message sent to a victim advocate from a phone number that belonged to C.K. and a map of the area where the car chase occurred. Slide 30 contained language from the jury instruction for count 5, stalking. Slide 31 provided the definition for harassment from the jury instructions. Slides 32 and 33 provided the definition of a credible threat from the jury instructions. Slide 34 contained the word "corroboration." Slide 35 contained the words "jail calls." Slide 36 had the heading "prior domestic violence evidence" and provided the relevant standard of proof, preponderance of the evidence, and its definition, "more likely than not." The final slide stated, "lesser included offenses." Three other slides were blank.

After the jury reached its verdict, and before sentencing, the trial court scheduled a status conference. At the conference, the court informed the parties that a printout of the prosecutor's presentation was inadvertently provided to the jury during deliberation. The court indicated it had researched the issue and reached a tentative ruling that under the guidance of *People v. Anderson* (2018) 5 Cal.5th 372 (*Anderson*), the error did not constitute jury misconduct and was subject to a harmless error analysis. The court tentatively concluded that a new trial was not required because there was not a reasonable probability of a more favorable result absent the error since all of the information contained in the presentation was provided to the jury and Ortega had not raised any objection to the closing presentation. The court then set dates for Ortega to submit a motion for a new trial based on the error.

Ortega presented his motion for a new trial and the district attorney filed opposition to the motion. The court then heard argument from counsel. Ortega's attorney asserted that this was a case of first impression, and unlike *Anderson*, which involved a single piece of unadmitted evidence inadvertently allowed into the jury room, the document at issue here constituted a roadmap to the prosecutor's desired result. Ortega's counsel also asserted that because the jury deliberated for approximately 90 minutes, before a four-day break in the middle, followed by another morning of deliberations before reaching the guilty verdicts, it was likely the jury inappropriately used the presentation as just such a roadmap to a guilty verdict. The prosecutor argued that the jury's consideration of the presentation was harmless error because it did not contain any new information. The trial court agreed with the prosecutor and denied Ortega's new trial motion.

## B

### *Legal Standards*

When the jury gains access to evidence or exhibits that the trial court did not intend to admit, the "situation is no different than if the same evidence had been proffered at trial and a valid objection to its admittance was erroneously overruled." (*People v. Gamache* (2010) 48 Cal.4th 347, 396–397 (*Gamache*).) "The situation is the same as any in which the court erroneously admits evidence. ... There has been merely 'an error of law ... such as ... an incorrect evidentiary ruling.' [Citation.] Such error is reversible only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error." (*People v. Cooper* (1991) 53 Cal.3d 771, 836.)

The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence "is so extremely unfair that its admission violates 'fundamental conceptions of justice.' " (*Dowling v. United States* (1990) 493 U.S. 342, 352.) "For the erroneous admission of evidence to amount to a denial of due process, the evidence must have been ' "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." ' " (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1025–1026.)

Without explanation, Ortega asserts that the mistake here was so egregious that his due process and fair trial rights were violated, requiring review under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24. Under this more rigorous standard, reversal is required unless the prosecution shows the error is harmless beyond a reasonable doubt. (*Ibid.*) Because all of the information in the document, with minimal exception discussed *infra*, was already in the jury's possession, we do not agree with

13

Ortega that this mistake was of constitutional significance. Accordingly, in this situation, we ask "whether, in light of all the other evidence properly admitted, the verdict this jury reached would have been the same absent exposure to the" presentation. (*Gamache, supra*, 48 Cal.4th at p. 397.)

C

*Analysis*

As discussed, the printed copy of the PowerPoint presentation that the jury inadvertently received contained only information that had already been provided to the jury in the form of evidence, instructions, and the prosecutor's closing argument. Further, of the 37 slides with content, only seven contained anything other than the charged counts, jury instructions, and the dates of the offenses. Of those seven, two slides had dates associated with uncharged domestic violence incidents plus the word "corroboration" under the dates; another contained only the word "corroboration"; one had the names of two medical professionals that testified in relation to counts 3 and 4; one had a heading, "Jail Calls," generally referencing an exhibit; one stated "lesser included offenses"; and the seventh had the words "fresh injuries" next to a photo of C.K.'s forehead showing a scratch. With respect to this last slide, the prosecutor argued that the photo showed the injury was recent, supporting her assertion the injuries occurred during the March 2021 incident.

Nothing in the presentation was new or "a revelation for the jury." (*Anderson, supra*, 5 Cal.5th at p. 421.) Rather, it was information already before the jury and it was provided in the exhibits and instructions given to the jury. In light of these facts, we agree with the Attorney General that the error did not create a reasonable probability that a more favorable outcome

14

would have resulted absent the error. Accordingly, the trial court's denial of Ortega's motion for a new trial was not an abuse of its discretion.

Ortega argues that because the court clerk mistakenly believed the presentation was received in evidence, the jury must have ignored instructions that the arguments of counsel are not evidence and considered it as such. Ortega also argues that because the jury filled out the verdict forms for the lesser included offenses—acquitting him of those offenses after it was instructed to leave the forms blank if it found Ortega guilty of the greater offenses—the jury must have had difficulty following all instructions and therefore viewed the presentation as evidence and used it as a "roadmap" to find Ortega guilty. Finally, Ortega (taking a contrary approach to that of his trial counsel) asserts the length of the jury's deliberation shows that "at least one juror was harboring a serious doubt on one or more of the counts," which he contends shows the error was prejudicial.

These arguments do not persuade us that a more favorable outcome was likely in the absence of the error. Contrary to Ortega's arguments, jurors are presumed to understand jury instructions intelligently and with common sense. (See *Boyde v. California* (1990) 494 U.S. 370, 381 [we assume jurors employ a "commonsense understanding of the instructions" with "all that has taken place at the trial likely to prevail over technical hairsplitting"].) The jury's failure to follow the court's instructions on the lesser included offense forms does not show its members did not understand or follow the instruction that the arguments of counsel were not evidence. (See *People v. Coddington* (2000) 23 Cal.4th 529, 594, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046 ["We credit jurors with intelligence and common sense ... and do not assume that these virtues will abandon them when presented with a court's instructions."]; *People v. Holt* (1997) 15 Cal.4th 619,

15

662 ["Jurors are presumed to understand and follow the court's instructions."].)  The instruction on how to complete the forms was technical and lengthy, and the jury's unnecessary completion of the lesser included offense forms does not show a general disregard for the jury instructions.

Further, as discussed, the presentation did not provide new information and differed only minimally from the evidence and jury instructions that were properly in the jury room.  For this reason, we do not agree with Ortega's assertion that the presentation served as a "roadmap" to his guilt.  The prosecutor's closing statement had already presented the jury with her obvious argument that Ortega committed the crimes for which he stood trial.  The substance of the presentation offered nothing new to the jury that addressed the credibility of the conflicting evidence.

Finally, the length of the jury's deliberation has minimal, if any, relevance to the question of prejudice.  This point is illustrated by the fact that Ortega's trial counsel argued that the short length of the deliberations showed the jury simply adopted the prosecutor's closing argument presentation, while on appeal his counsel asserts that if the evidence was overwhelming, "the jury would not have needed an afternoon followed by a full day to deliberate, reaching a decision a mere ten minutes before they would have been required to stop deliberating on that second day."

The length of the jury's deliberation is of limited relevance in light of the extensive testimony at trial, over the course of 11 days, recounting events that occurred during a multiyear period, going to five counts stemming from three separate incidents.  Less than two days of deliberation in light of this record is not so lengthy that it establishes the jury's decision was a close one,

supporting a finding of prejudice as a result of the error.[4] (See e.g., *In re Sassounian* (1995) 9 Cal.4th 535, 548–549, fn. 10 [lengthy jury deliberations and requests for rereading of testimony and clarification of instructions does not establish the case was close, and may instead be attributable to factors such as the extensiveness of the evidence].)

In sum, while it is unfortunate that the court's clerk mistakenly provided the jury with the prosecutor's presentation, we cannot say in the particular circumstance that Ortega was prejudiced by its presence in the jury room.

## DISPOSITION

The judgment of conviction is affirmed.

McCONNELL, P. J.

WE CONCUR:

DATO, J.

DO, J.

---

[4] We also note that there is no indication in the record before this court that Ortega's trial counsel sought to contact or interview any of the jurors to determine whether the presentation was used during deliberations.

17